UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 20-76 (PAM)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S POSITION ON SENTENCING |
| MUHAMMAD MASOOD, | |
| Defendant. | |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorney Andrew R. Winter, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of twenty years' imprisonment followed by a term of supervised release is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.      INTRODUCTION

*"i want to kill and get killed...and kill and get killed…and again and again"*

*"i wonder if I will miss the opportunity of attacking the enemy when I was in the middle of it."*

*"i want to be part of the army that meets the Rum at Dabiq or Amaq[1] inshAllah"*

Defendant's statements to a confidential human source in February 2020

On August 16, 2022, Muhammad Masood ("Defendant") entered a straight plea to the charge of Attempting to Provide Material Support to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. §§ 2339B(a)(1). A multi-lingual researcher at a world-renowned medical clinic, Defendant sought to join the ranks of ISIS, pledging an oath of allegiance to, and volunteering to kill for, the terrorist organization. His explicit communications, detailed preparation, and exhaustive efforts to travel overseas to join ISIS all evidence Defendant's plan to support the organization as both a fighter and a combat medic.

**THE FACTS**

In early 2018, Defendant traveled to the United States on a non-immigrant visa having been sponsored by a medical clinic in Rochester, Minnesota. ECF Doc. 103, Presentence Investigative Report (hereinafter "PSR"), ¶ 63. Two years prior, he had

_____

[1] In Islamic eschatology, it is believed that Dabiq is one of two possible locations (the other is Amaq) for an epic battle between invading Christians and the defending Muslims which will result in a Muslim victory and mark the beginning of the end of times.

2

earned a Bachelor of Medicine and Bachelor of Surgery degree at the Islamic International Medical College in Islamabad, Pakistan. PSR ¶ 90. While living and working as a medical researcher in Rochester, he met a woman online which resulted in their marriage in August of 2018. Less than a year later, the two separated and then divorced – apparent fallout from Defendant's demand that she conform her behavior to strict Islamic tenets. PSR ¶ 64. Defendant would also fail the foreign medical graduate licensing exam. PSR ¶ 79. With his marriage dissolved, his medical career in jeopardy, and a growing frustration with living among the *kuffar* (infidels or non-believers) in the United States, Defendant opted for a different path.

### Defendant's Path to a Terrorist Organization

By his own account, Defendant searched for the "truth" in 2019 and began listening to the lectures of Islamic extremists such as Anwar Al-Awlaki. PSR ¶¶ 16, 29. An English-speaking American imam, Al-Awlaki was a leading propagandist and recruiter whose sermons resonated with Islamic radicals in the U.S. and Britain. In lectures posted online, Al-Awlaki repeatedly called for violence against American civilians.[2] PSR ¶ 16. Defendant would later admit that it was through Al-Awlaki's lectures, he learned that ISIS was "*where the truth was*." PSR ¶ 16.[3]

On October 15, 2004, al-Qaeda in Iraq was designated by the U.S. Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act. On May 15, 2014, al-Qaeda's designation was amended by the U.S.

---

[2] *See www.britannica.com/biography/Anwar-al-Awlaki.*
[3] Defendant admitted to probation that he was impacted by the messages contained in the Islamic extremist propaganda material he consumed.

3

Secretary of State to add the Islamic State of Iraq and al-Sham (ISIS), including other alias names, to its foreign terrorist organization listing. ISIS has remained a designated foreign terrorist organization since that date. PSR ¶ 6.

Defendant wrote to CHS-1 that he would need weapons training when he joined the organization, and he discussed the use of small drones that could be purchased online and turned into *istishhadi* (martyrdom) drones for use in Syria or against the United States. PSR ¶ 11, 12. Because "*qiyamah* [judgment day] *is very close*" Defendant specified that he wanted to be in Syria where his radicalized thinking led him to believe a battle signaling the end of times was to occur. *Id.* Underscoring his self-radicalized path, the evidence shows that Defendant wanted to wage *jihad*. [4] As Defendant explained it, "*you have to do your jihad always... because if you dont do jihad and dont have intension to do jihad then you die on a branch of nifaq* [hypocrisy of true Muslim faith]." PSR ¶12.

In his conversations online and in-person, Defendant revealed the simmering radical ideology that had secretly taken hold. Exposing his disdain for the *kuffar* (the infidels) in the U.S., Defendant confided that he "*hates smiling at the passing kuffar just to not make them suspicious...I cannot tolerate it anymore*". Further, Defendant revealed that he had contemplated violence against the citizens of the United States: "*There is so much I wanted to do here...lon wulf (sic) stuff you know...*". Tellingly, Defendant admitted that he wanted to conduct an attack while "*behind enemy lines*" and wondered,

---

[4] "Jihad" is an Arabic word that literally means striving or struggling, but in the context of ISIS supporters, commonly refers to a holy war, fight, or struggle against the enemies of Islam.

"*if I will miss the opportunity of attacking the enemy when I was in the middle of it.*" PSR ¶ 9.

### *Defendant Prepares to Travel Overseas to Join ISIS*

After consuming the radical teachings of Al-Awlaki in 2019, Defendant sought out help to travel overseas to wage *jihad*. In early January of 2020, Defendant used an alias to communicate on an encrypted messaging platform in his quest for help making *hijra*.[5] PSR ¶ 7. Ever careful about exposing his plans to law enforcement, Defendant communicated on an encrypted messaging app which "self-destructed" his communications after one hour:



*Screen capture from Defendant's messaging profile*

Defendant did not know, however, that the person who responded to him on the platform was a confidential human source ("CHS-1") employed by the FBI. For the next two months, Defendant communicated with CHS-1, seeking his encouragement and help in making the journey to Iraq or Syria to join the fight. Defendant told the CHS that he wanted to "*fight on the frontline as well as help the wounded brothers*", and he insisted that *"a person like me belongs on the frontline not anywhere else.*" PSR ¶ 8.

---

[5] "Hijra" or "Hijrah," is an Arabic word meaning "migration" but was commonly used by ISIS to refer to migration to ISIS-controlled territory for the purpose of joining or supporting ISIS. PSR ¶ 8.

When CHS-1 confronted Defendant with the prospect that he may have to take someone's life, Defendant eagerly offered to *"to kill and get killed... and kill and get killed"* and adding, *"this is what even rasool Allah saas [the messenger of Allah] wished."* PSR ¶ 13. He wrote to the CHS that he needed weapons training. PSR ¶ 12. Defendant volunteered to help the terrorist organization in other ways. He offered to design *istishaddi* [martyrdom] drones that could be used by ISIS on the battlefield:



PSR ¶ 11.  Defendant admitted that he had seen such drones used by ISIS ("*dawla*") in videos[6] he had watched previously:

---

[6] In this and all the images of exchanges set forth in this memorandum, Defendant's words appear with a white background while the CHS's appear with the yellow background.



Defendant continued to discuss this drone concept, insisting they must be "creative":









Through his encrypted communications with the CHS, Defendant also revealed that he contemplated committing "lone wolf" attacks. Defendant told the CHS that he wanted to conduct an attack "*behind enemy lines*" because many other people cannot "*reach here to attack*." PSR, ¶ 9. He went on to lament, "*i wonder if I will miss the opportunity of attacking the enemy when I was in the middle of it.*" Defendant later

8

revealed "*there is so much I wanted to do here...lon wulf (sic) stuff you know...but I realized I should be on the ground helping brothers sisters kids.*" PSR ¶ 14.

In addition to fighting, building drones, and committing terrorist attacks in the U.S., Defendant also offered to CHS-1 that he could use laptops he planned to bring with for "*ops stuff inshAllah*" (Complaint Affidavit, para. 39) and he sought out a way to donate Bitcoin to ISIS. ***[CITE]***

### Defendant Pledges His Allegiance to ISIS

As his plan to join ISIS crystalized, Defendant met with a person he believed to be an ISIS commander located in a foreign country. PSR, ¶¶ 15-17. On February 19, 2020, Defendant made the 90-minute drive from Rochester to a Bloomington hotel, where he sat in front of a computer screen communicating with the person who was to vet Defendant for membership in the terrorist organization. It was, essentially, a job interview:



*Screen-capture from the February 19, 2020, meeting with an FBI CHS*

At the outset of this meeting, Defendant was asked if he still wanted to make *hijra*. He replied in the affirmative, adding that he was "*sick of this place*". When specifically asked about his intentions, Defendant said his aim was to join the terrorist organization where he could "*be a combat medic…and also fight*." PSR ¶ 16. He also urged, "*I want to go, like today."* PSR ¶ 17.

During this recorded meeting in the hotel, Defendant explained how he had come to ISIS. Defendant said that he had been looking for the truth and started listening to Anwar al-Awlaki's lectures. According to Defendant, he learned that "*Dawla al Islamiya in Iraq (ISIS) was where the truth was*." He said that he had "*seen how the kuffar [*infidels*] are after coming to the United States and now understands them better*" and "*if you want to learn the haqq* [the truth] *you have to see which direction the kuffar's arrows are pointing so that's how I found Dawla*." Defendant agreed he would arrange travel for the end of March of 2020 and at the close of this meeting, Defendant offered an oath of allegiance in Arabic to ISIS. PSR ¶ 17.

After the meeting at the hotel, Defendant prepared in earnest to depart the U.S. He resigned his research position at the medical clinic, he gave notice to his landlord that he would be vacating his apartment, and he listed his household items for sale on an internet-based marketplace. He bought a train ticket that would take him to Chicago, and he bought a ticket for air travel from Chicago to Amman, Jordan. PSR ¶ 19. Barely able to contain his excitement, Defendant told the CHS that "*those few days between [March] 17 to 21 are going to be the most difficult days for me…but may Allah make it easy i am*

*excited as well as worried haha strange*." *See* ECF Doc. 1 (Criminal Complaint Affidavit), at para. 30.

In many of his conversations, Defendant revealed that he knew his conduct was highly illegal. For example, Defendant requested a fake visa from CHS-1 to keep his identity "clean" for future travel after joining ISIS. ECF Doc. 1 at para. 29. He also explained he did not want to arouse suspicions, suggesting to the CHS-1 that he needed to complete tasks in a logical way to avoid attention. ECF Doc. 1, para. 29.[7] Defendant would later message CHS-1 with the information that because he had shared one of those Al-Awlaki propaganda videos, Defendant believed he was on a 'watchlist':

> i dont know...i am just thinking like that because it is not typical of me to go up to the cities that often...but i shared one day a video by anwar al awlaki to my brother on whatsapp group...so i think that after i did that i must be on some sort of watch list etc. its just my perception...may Allah protect us ameen
>
> 7:53 PM

Defendant's concern about being followed or caught was compounded by the ISIS propaganda he had consumed. The following is one of the deleted images from a thumbdrive in Defendant's possession when he attempted to travel to LAX. This "infographic"

---

[7] In stark contrast, Defendant told Probation that he was "*shocked when he was arrested at the airport because he had not understood the severity of what he got himself involved in.*" PSR ¶ 30. This, along with Defendant's continued claim that, despite the documented conversations with the CHSs in this case, his "*intended support was to provide medical care for refugees*" (*Id.*) demonstrates to this Court that he is unwilling or unable to acknowledge the scope of his criminal conduct.

provides warnings and advice to "the supporters of the mujahidin" about the methods of

law enforcement ("the enemies of Allah") designed to intercept a traveler making *hijrah*:



Ever careful, Defendant asked CHS-1 what he should do with the iPhone they

used to communicate while he was *en route* to join ISIS. In a February 22, 2020, message

exchange, Defendant expressed his specific concern about the suspicion that carrying two

phones would create, and he discussed options for avoiding suspicion including

separating the cell phones from each other and placing the battery and phone in different items of luggage so he could claim his phone was broken. *See 20-mj-225* (DTS) (para. 34 of affidavit in support of search warrant). Once again demonstrating caution, Defendant revealed to CHS-1 that he had been studying (and was prepared to use) the counter-surveillance tactics recommended by another well-known terrorist organization, *al Qaeda*:

> i read in a book...it was by al qaeda though...to know how to spot if someone is following you or not
>
> 7:49 PM

### A Global Pandemic Forces a Change in the Plan

As Defendant formulated his plan to join ISIS, an unanticipated event – the COVID-19 pandemic – forced a change. Because Jordan had closed its borders (PSR ¶ 21), Defendant instead agreed to board a cargo ship that would take him from Los Angeles, California, to ISIS-controlled territory. In conversations with CHS-1, Defendant made it clear that he wanted to go to "*AshSham*" (Syria) and that he was willing to accept the risk of illegal travel "*if the brothers really need me...*". PSR ¶ 22. On or around March 16, 2020, Defendant messaged CHS-1 that he had purchased an airline ticket for travel from Minneapolis to Los Angeles with a scheduled departure of March 19, 2020. *See* ECF Doc. 1 (Criminal Complaint Affidavit), at para. 37.

### a. Defendant Arrested Attempting to Board a Flight

On March 19, 2020, Defendant took a shuttle bus from Rochester, Minnesota, to the Minneapolis/St. Paul International Airport to catch his flight to Los Angeles. FBI

agents arrested Defendant after he proceeded through the airport security checkpoint. PSR ¶ 23. In a subsequent search of both his checked and carry-on luggage, agents found numerous items evidencing his plan to become a soldier and a combat medic for ISIS. Among numerous other items, Defendant had packed a black balaclava, tactical vest, ammunition pouches, black military fatigues. All useful, of course, for combat:



Agents also found hand-written notes of Defendant in an airport trash receptacle which contained multiple references to assault rifle ammunition, .107-caliber rockets, machine guns, body armor, plastic explosives, and illumination rounds. PSR, Addendum at p. 26. Consistent with his stated desire to be a "combat medic", Defendant had also brought medical supplies and scrubs in his luggage.

Defendant also packed an extraordinary number of electronic devices. PSR ¶ 24. This trove of electronics can be explained, in part, by Defendant's statement 10 days earlier that laptops he planned to bring with him could be used for *ops stuff inshAllah*." Complaint Affidavit, para. 39. The complete list of devices seized from Defendant included the following:

- a Samsung Galaxy SM-N950U 64GB Note 8 cell phone;
- a DHP convertible laptop computer;
- a PINE64 14" Pinebook Pro LINUX laptop;
- a Samsung SM-T865N tablet;
- three (3) generic-colored thumb drives;
- a Samsung EVO 128GB MicroSD card, contained in a Samsung SD adapter;
- a SanDisk Ultra 16GB SD card;
- a HP 8GB thumb drive;
- a Samsung NP700Z5C-S02UB Notebook computer;
- an HP 14t-cd100 Pavillion x360 convertible laptop computer;
- a flash drive, with printed label "Card Reader T-FLAHS[sic] USB 2.0";
- a Samsung MU-PA500B 500GB external hard disk drive;
- a Transcend StoreJet 1TB external hard disk drive;
- a Samsung XE500T1C Notebook laptop computer;
- a Samsung SM-R730V Gear S2 watch;
- a Kexinda W1 watch; and
- four (4) USB adapters.[8]

On the 8-gigabyte HP brand thumb-drive, agents discovered hundreds of deleted images. Among these deleted images was ISIS propaganda, including photographs of ISIS fighters wearing black balaclavas (like the one Defendant had packed in his suitcase) committing grisly executions, assault weapons, as well as "infographics" (like the "Harvest of Soldiers" depicted below). PSR ¶ 25. The following are just a few examples of those deleted images found on Defendant's HP brand thumb-drive:

---

[8] *See* 20-mj-255 (DTS)(search warrant affidavit for digital devices seized)









*Post-arrest Proceedings*

Following his arrest, Defendant was detained. Counsel for Defendant then moved for a competency examination. After initially being found incompetent to stand trial he would be restored to competency in 2022. ECF Doc. 53. He thereafter entered a straight plea to the single charge in the indictment. U.S. Probation prepared and filed the PSR for the Court and parties.

## III.   THE REPORT OF PRESENTENCE INVESTIGATION

### A.   Factual Statements and Sentencing Guidelines Calculations in the PSR

The United States has no objections to the factual assertions in the PSR. The PSR calculates a base offense level of 26 for Count 1, Attempting to Provide Material Support to a Designated Foreign Terrorist Organization. PSR ¶ 34. The United States concurs that the terrorism adjustment of U.S.S.G. § 3A1.4 applies, resulting in a 12-level increase in offense level and a criminal history of Category VI. PSR ¶ 36. With a 3-level reduction for acceptance of responsibility, the resulting advisory guidelines range is 292 to 365 months. However, the statutory maximum penalty is twenty-years, therefore the adjusted guideline term of imprisonment is 240 months, pursuant to USSG §5G1.1(a). PSR ¶ 105.

### B.   Terrorism Adjustment Under U.S.S.G. § 3A1.4(a)

#### 1.   *Legal Standard*

Defendant challenges the application of the 12-level terrorism enhancement under U.S.S.G. § 3A1.4, which states that if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," then 12 levels are added to a

defendant's base offense level, and the criminal history category automatically becomes the maximum of VI. The term "federal crime of terrorism" used in § 3A4.1 "has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." *See* U.S.S.G. § 3A1.4, cmt. n.1. Under 18 U.S.C. § 2332b(g)(5), an offense qualifies as a federal crime of terrorism if it is (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," § 2332b(g)(5)(A); and (2) enumerated in § 2332b(g)(5)(B). Defendant disputes the first requirement.[9]

This Court must find this first requirement by a preponderance of the evidence. *United States v. Jayyousi,* 657 F.3d 1085, 1115 (11th Cir. 2011); *United States v. Awan,* 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Ashqar,* 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement). The Court may draw reasonable inferences regarding the defendant's intent in committing the crime based upon the evidence. *See United States v. Mohammed,* 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming the district court's application of the terrorism enhancement where the court "pointed to specific statements in the record – which [the defendant] does not dispute he made – from which it [the district court] drew plausible inferences").

Notably, "[a] district court need not wait for the defendant to confess a specific intent to influence the government. The court can find this intent based on circumstantial evidence and reasonable inferences from the facts presented." *United States v. Wright,*

---

[9] Defendant pled guilty to violating 18 U.S.C. 2339B(a)(1). This is a listed crime for purposes of the enhancement, and he does not argue otherwise. *See* 18 U.S.C. § 2332b(g)(5)(B).

747 F.3d 399, 419 (6th Cir. 2014). The cases therefore focus on the defendant's support of the terrorist organization and awareness that the offense conduct works in furtherance of the organization's goals. *See, e.g.*, *United States v. Ali*, 799 F.3d 1008, 1031–32 (8th Cir. 2015); *Wright*, 747 F.3d at 419; *United States v. Hassan*, 742 F.3d 104, 149–50 (4th Cir. 2014);  *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011); *Awan*, 607 F.3d at 317–18.

Finally, an intent to influence the government need not be a defendant's *only* purpose in committing the offense. So long as a defendant intended to influence the conduct of government, the terrorism enhancement will apply "even if the defendant also harbored other motivations, such as an intent to gain financial reward or impress a sweetheart."  *Wright*, 747 F.3d at 418 (Clay, J., concurring); *see also United States v. Awan,* 607 F.3d 306, 316–18 (2d Cir.2010). This is because a distinction can be drawn between what motivates a person to do an act and what that act is calculated to achieve.

### 2.  *Analysis*

In the case at bar, the direct and circumstantial evidence discussed below, combined with reasonable inferences from the facts presented prove by a preponderance of evidence that Defendant had the intent to influence the conduct of government by attempting to provide material support to ISIS.

First, Defendant's plea colloquy established that he had offered to provide personnel (himself) to ISIS knowing that ISIS had been designated as a foreign terrorist organization or that it engaged in terrorist activities. Plea Transcript, p. 22. Defendant also acknowledged under oath that his pledge to ISIS was "*a pledge to help the*

organization" (*Id.* p. 16) and that he was "*tired of the United States.*" *Id.* p. 19. He also acknowledged that he viewed himself as someone who belonged on the front lines of the battlefield. *Id.* p. 20. These admissions prove his awareness that the offense conduct worked in furtherance of the ISIS's goals.

Even more persuasive are Defendant's multiple conversations with two separate FBI CHSs during the course of the offense conduct. These statements – both in-person and over an encrypted messaging app – readily establish that the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. From his offer *"to kill and get killed... and kill and get killed"* to his ruminations about committing lone wolf attacks "behind enemy lines" (i.e., in the U.S.[10]), to volunteering to make *istishaddi* drones, to swearing an oath of allegiance to ISIS, Defendant's statements evidence that he intended to help the terrorist organization wage war against the *kuffar*. Defendant – whatever his motivations for joining ISIS – had calculated that he would take up arms and kill for ISIS.

Defendant's theological discussions with both CHSs guide this Court to understand – at some level – why Defendant chose this path. For example, Defendant told CHS-2 that he had "*seen how the kuffar are after coming to the United States and now understands them better.*" PSR ¶ 16. He told CHS-1, "*i wanna [sic] go to sham because*

---

[10] There can be no better direct evidence of Defendant's desire and intent to influence or affect the conduct of government than to attack a government's homeland and kill its citizens.

may be *qiyamah*[11] *is very close . . . and inshAllah i want to be part of the army that meets the Rum at Dabiq or Amaq*[12] *inshAllah*." Further, Defendant explained, "*if you dont [sic] do jihad and dont [sic] have intension to do jihad then you die on a branch of nifaq.*[13]" PSR ¶ 12.

Finally, other evidence supports the conclusion that Defendant had the intent to influence the conduct of government. From the clothing he packed (a black balaclava, tactical vest, ammunition pouches, black military fatigues) to the array of digital devices he brought with him (including computers that ISIS could use for "*ops, Inshallah*") to his desire – albeit fanciful – to design an *istishaddi* drone capable of setting fire to the enemy's occupied compound, the body of evidence before this Court overwhelmingly proves that his offense was calculated to influence the conduct of government. As such, probation properly applies the enhancement found at U.S.S.G. § 3A1.4.

## IV.   ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should

---

[11] *Qiyamah* refers to Islamic concept of the "Day of Judgment," Allah's final assessment of humanity, which includes the annihilation and judgment of all sentient creatures.

[12] In Islamic eschatology, Dabiq is one of two possible locations (the other is Amaq) for an epic battle between invading Christians and the defending Muslims which will result in a Muslim victory and mark the beginning of the end of times.

[13] *Nifaq* means hypocrisy. The word is used to describe people who publicly show themselves as a Muslim but are not following the true religion.

first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). The government herein recommends a 20-year term of imprisonment. This sentence satisfies 18 U.S.C. § 3553(a) standard of being sufficient, but not longer than necessary, to effectuate the objectives of federal sentencing law and policy.

The nature and circumstances of the offense are detailed above. Defendant stands convicted of a crime related to international terrorism and the terrorist organization he sought to assist is one of the most dangerous and violent in existence and the threat to the national security of the United States for this crime is significant. The seriousness of the nature and circumstances of a terrorism case wherein the terrorist organization is ISIS, is a reason for a lengthy term of imprisonment in this case.

23

The history and characteristics of Defendant do not present mitigating circumstances. He graduated from medical school in Pakistan, managed to maintain full-time employment at a world-renown medical clinic, and has the strong support of his family. (PSR ¶¶ 55-68). Despite all that, he chose a path to become a soldier and combat medic for a terrorist organization. While Defendant has no prior criminal history (PSR ¶ 45), his conduct here does not represent a single, impulsive or rash act. Rather, Defendant's conduct involved multiple steps and detailed preparation over the course of months. Defendant did more than just listen to radical jihadists and harbor extremist beliefs. He chose action after extensive deliberation. Furthermore, his decision to join ISIS involved his own theological justification to wage *jihad*, commit murder, and become a martyr for the organization. Defendant's fear of his father's disappointment in him (PSR ¶ 28) does not suggest this is a case for leniency.

Defendant's communications with the U.S. probation officer after his guilty plea (PSR ¶¶ 28-32) are troubling as they evidence a man who refuses to fully acknowledge his offense conduct. This denial, in turn, creates a barrier to any rehabilitation. Though he has admitted the elements of the offense, Defendant still attempts to portray himself as concerned *only* for the plight or refugees and children. He benignly claims he "was willing to do whatever was asked of him to facilitate his travels." PSR ¶ 30. And as noted above, Defendant made the absurd claim that he "was shocked when he was arrested at the airport because he did not understand the severity of what he got himself involved in." *Id.* This is a troubling disconnect – particularly for such a serious offense. Defendant

absolutely understood the severity of his crime and he had multiple opportunities to abandon his efforts – yet he remained steadfast.

The Supreme Court has recognized combating terrorism as "an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S. Ct. 2705, 2724 (2010). The offense's seriousness is adequately reflected in a twenty-year sentence, as is respect for the law and just punishment. A significant sentence in this case is also needed for individual and general deterrence. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)). The requested sentence is necessary to deter individuals, like the defendant, from supporting international terrorism. As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project* at 2725. Ultimately, it is important for the public to know that those who support terrorist organizations will face serious punishment for their actions. For this, and all the reasons set forth above, a twenty-year sentence for this Defendant is reasonable.

## V.    CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence Defendant to a term of imprisonment of twenty years, followed by a reasonable term of supervised release.

Dated: August 7, 2023                 Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Andrew R. Winter*

BY: ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 0232531