UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal Case No. CR 20-76 (PAM/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT'S POSITION** |
| | ) | **ON SENTENCING** |
| MUHAMMAD MASOOD, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

Defendant Muhammad Masood was trained and employed as a physician in his home country of Pakistan. His family pressured him to come to the United States to take an unpaid position as a medical researcher at the Mayo Clinic with the expectation that the further professional training and experience would open more opportunities and advance his career. (He eventually was hired for a paid position of research coordinator). Unfortunately, the path that Mr. Masood's family envisioned for him was not the right path for Mr. Masood. Everything went wrong. Mr. Masood, who had a history of mental illness and hospitalization in Pakistan felt socially isolated, depressed and culturally alienated in Rochester. He failed a  medical licensing examination that was necessary to become a practicing physician in the United States. Mr. Masood tried to build a life for himself by getting married but his wife broke off the marriage within six months due to trust issues and Mr. Masood's disturbing mental health symptoms.

Mr. Masood's mother visit him in Rochester in late 2019. His father planned to visit in April, 2020. Mr. Masood was afraid to face his father because he believed he had failed him. Mr. Masood settled on a plan to use his medical skills to treat child refugees in Syria. This plan would fit Mr. Masood's skills while also enabling him to avoid facing his father. Mr. Masood looked into working through legitimate NGOs but found that his medical license from Pakistan was insufficient to obtain a position through these organizations. He made other inquiries on the internet which led to contact with an undercover FBI informant posing as an Islamic State operative. Mr. Masood had become susceptible to an extremist route due to his isolation and depression, his desperation to escape his current circumstances, and because he been exposed to extremist messages on the internet which he was not able to discuss and vet with anyone else due to his isolation.

It is clear from the recordings of Mr. Masood's conversations with the two FBI informants that his primary motive for working with the Islamic State to go to Syria was to provide medical services. When Mr. Masood was arrested at MSP airport on his way to Los Angeles with the expectation of taking a cargo ship to the Middle East (a strangely circuitous route), he was in possession of a substantial amount of medical gear. Mr. Masood, however, also told the FBI informant posing as an IS leader that he was prepared to fight since the informant made clear that was a prerequisite to participating, He also sent text messages to the FBI informant expressing support for IS' goals and his desire to fight, as well as provide medical care, in order to gain acceptance and assistance with his

travel plans. It is because of these oral and written statements that Mr. Masood has pled

built and accepts responsibility for the offense of providing material support for a foreign

terrorist organization in violation of 18 U.S.C. § 2339B.

     Mr. Masood's engagement in a plan facilitated by FBI informants to travel to

Syrian and join the Islamic State was an act of desperation brought on by Mr. Masood's

personal struggles and failures, his social and cultural isolation, and enabled by his

serious mental illness which severely interfered with his judgment. It is a sharp and

isolated aberration. Mr. Masood had not at any other time engaged in any unlawful

activities and he has never harmed or attempted to harm any person. Since Mr. Masood's

arrest, he has received extensive psychological treatment including in a BOP medical

center as part of the competency restoration process, and has voluntarily participated in

multiple therapy groups and individual therapy at the Sherburne County Jail. Mr. Masood

has gained a great deal of self-awareness and an understanding of how to cope with his

mental illness. Forensic psychological and psychiatric evaluations which are being

simultaneously submitted document how Mr. Masood's mental illness substantially

impacted his offense, and how he is not a dangerous person. He is neither in actuality a

terrorist nor an extremist.

     This Memorandum will address the proper application of the advisory sentencing

guidelines and the justifications for downwards departures or variances based on Mr.

Masood's mental illness and other psychological factors contributing to he offense, his

aberrant conduct, his lack of intent to engage in violence, his post-offense rehabilitation, the hardship he has already endured from almost 3 1/2 years in pretrial custody, and other circumstances establishing that Mr. Masood does not pose a danger to the community. Although the base offense level of 26 and Mr. Masood's lack of any criminal history would yield an advisory sentencing guideline range of 46-57 months. the government and probation are recommending application a terrorism enhancement which would result in a sentencing guideline range above the 20 year statutory maximum. This requisites for this enhancement have not been met due to the lack of evidence that Mr. Masood's actions were directed at the conduct of any government. If the enhancement is not applied the guideline range would reflect an appropriate sentence. If the enhancement were applied, then a very sharp downward variance is warranted based on the applicable statutory factors under 18 U.S.C. § 3553(a).

## II.     THE TERRORISM ENHANCEMENT IS INAPPLICABLE.

Mr. Masood objects to the PSR's proposed application of the terrorism enhancement under U.S.S.G. §3A1.4, and therefore object to the 12 level increase Mr. Masood's offense level and the increase in his criminal history category from I to VI even though he has no previous criminal history whatsoever.  (PSR, paragraphs 36, 49). §3A1.4 applies if the offense "involved, or was intended to promote, a federal crime of terrorism.  §3A1.4, Application Note 1 defines "federal crime of terrorism" as set forth in 18 U.S.C. § 2332b(5).   § 2332b(5)(A) requires that the offense must be "calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." § 2332b(5)(B) then requires lists the offenses that are eligible for the definition include 18 U.S.C. § 2339B. The fact that the offense must both include the violation of a specific statute **and** be calculated to influence the conduct of a government by intimidation or coercion or retaliate against government conduct, makes clear that a violation of § 2339B is not automatically a "federal crime of terrorism" which qualifies for the terrorism enhancement under the sentencing guidelines.

Mr. Masood's primary purpose, based on both his intentions and the statements of the FBI informants who were purportedly recruiting him, was to provide medical care. Mr. Masood's statements about his willingness to fight were intended on his part to show his commitment so that he would be accepted, and for the purposes of the FBI informants, to elicit statements from Mr. Masood which satisfied the elements of the offense. There was nothing specific ever discussed about affecting the conduct of any government or retaliating against government conduct. The PSR does not indicate any discussion about any government much less influence government conduct or retaliating against any government conduct. The government does not have such evidence. There was certainly no evidence of any "calculation" by Mr. Masood to attain such results.

Recent appellate cases make clear that there can be a distinction between violation of a statute relating to terrorism and attempting to influence or retaliate against a foreign government.  United States v. Alhaggagi, 978 F.3d 693 (9th Cir. 2020) stated that it is

possible for a defendant to commit the crime of material support to a terrorist group

without intending the support to influence or retaliate against a foreign government, and

in this case government failed to prove defendant had the necessary specific intent  to

commit terrorism crime by distributing ISA propaganda on social media. Alhaggagi

distinguished the lead 8th Circuit case of United States v. Ali on the grounds that the

defendants sent money to al Shabaab after "Shabaab leaders directly communicated to

defendants about victorious battles and suicide bombings, defendants vocally supported

and expressed gratitude for al Shabaab's anti-government effort, and defendants raised

funds to support that effort." Alhaggagi, 978 F.3d at 703 n. 10 (citing United State v. Ali,

799 F.3d 1008, 1016, 1031-32 (8th Cir. 2015)). The instant case is similarly

distinguishable from Ali as Mr. Masood did not communicate with the FBI informants

posing as an IS operative and leader about the Islamic State's actual political objectives or

its military accomplishments, and did not express any political agenda or any government

related goals. Mr. Masood expressed a desire to be a combat medic and at worst sent text

messages to show his commitment to the organization, but did not indicate any

expectation or intention of accomplishment any specific goals, much less influencing or

retaliating against a government.

    United States v. Arcila Ramirez, 16 F.4th 844 (11th Cir. 2021) also held that it was

erroneous to apply the terrorism enhancement where the defendant supplied firearm parts

and components to foreign terrorist group but without proof that his conduct was

calculated to influence or retaliate against a government. This case is highly instructive of the instant case where Mr.  Masood expressed a desire to join IS without any proof that his conduct had any calculated objectives beyond providing medical care and at most being part of military struggle. See also United States v. Ansberry, 976 F.3d 1108, 1126-29 (10th Cir. 2020)(It was error to apply the terror enhancement where defendant attempted to detonate a bomb in front of a police station in retaliation for prior actions of a town marshal where there was no evidence the action was calculated to retaliate against a government); United States v. Jumaev, No. 12-CR-00033-JLK, 2018 WL 3490886, at *6 (D. Colo. July 18, 2018), aff'd, 20 F.4th 518 (10th Cir. 2021)(although the defendant was found guilty under 18 U.S.C. § 2339B, the terrorism enhancement does not apply because there was no **specific intent** to commit crimes calculated to influence or retaliate against a foreign government). These holdings apply equally to the conduct of Mr. Masood who also lacked any specific intent to influence or retaliate against a foreign government.

## III.    DOWNWARD ADJUSTMENT FOR UNCOMPLETED CONSPIRACY.

Mr. Masood should receive a three level downward adjustment to his base offense level  pursuant to U.S.S.G. § 2X1.1(b)(1) which applies to attempts or conspiracies to commit an offense. The Indictment in this case alleges an attempted violation of 18 U.S.C. § 2339B. (Doc. 20 at 1). It does not allege that there as a completed offense.  It is informative to note that although this provision under subsection (d)(1)(A) excludes

offenses under 18 U.S.C. § 2339A, it does not exclude § 2339B which is the offense in this case. There does not appear to be any reason why this provision would not apply to this case.

The Addendum to the PSR cites Appendix A of the Sentencing Guidelines Manual for the proposition that "all violations of 18 U.S.C. § 2339B are referenced to USSG §2M5.3 to determine the offense level, and the applicable offense guideline does not provide any instruction for a cross reference to another guideline section for attempted offenses." (PSR Addendum at A.3). Appendix A is a guide to assist a reader of the sentencing guidelines in located the applicable provisions. There is no indication that it is an authoritative statement on all guidelines provisions that may apply to any particular offense.

The Addendum next points out that the statute itself encompasses attempts and conspiracies. (PSR Addendum at A.3-4). There is no explanation provided as to why this would prevent the application of § 2X1.1 where the offense conduct is an attempt rather than a completed offense.  In fact, an attempt needs to be written into the statute in order to make it a crime.  It is established that, "To attempt a federal crime is not, of itself, a federal crime. Attempt is only actionable when a specific federal criminal statute makes it impermissible to attempt to commit the crime." United States v. Anderson, 89 F.3d 1306, 1314 (6th Cir. 1996)(citing United States v. Rovetuso, 768 F.2d 809, 821 (7th Cir.1985), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986); United

States v. Manley, 632 F.2d 978, 987 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); United States v. York, 578 F.2d 1036, 1038 (5th Cir.), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682 (1978)); see also United States v. Manley, 632 F.2d 978, 987 (2nd Cir. 1980); United States v. Kicklighter, 192 F.Supp.2d 788, 790 (E.D. Tenn. 2002).  If 18 U.S.C. § 2339B did not include an attempt, than Mr. Masood would not have committed any crime. The fact that he is charged with attempt rather than committing the substantive crime makes a reduction in the offense level appropriate.

The Addendum finally argues that this reduction should not apply because "Masood completed all acts he believed necessary for successful completion of the offense or the circumstances demonstrate he was about to complete all such acts but for apprehension or interruption by some similar event beyond his control." (PSR Addendum at A.4 citing U.S.S.G. §2X1.1(b)(1). The reality is that Mr. Masood had not completed all of the acts necessary for completion of the offense and was not about to complete them. In order to have provided material support to the designated foreign terrorist organization under his plan, he would have needed to go to Syria and take up arms or provide some sort of actual material assistance. Mr. Masood was arrested at the MSP airport. In order to complete his plan, he still would have had to get to Los Angeles, board a cargo ship, arrive somewhere in the Middle East, make his way to Syria, and then somehow provide his services (beyond medical help)  to the Islamic State. There was ample opportunity for

Mr. Masood to change his mind and not follow through on his plan, and thereby not

complete the offense. The offense was clearly at the attempt stage and not close to

completion. The reduction in the offense level provided for attempts is very much in

order.

## IV.    MOTIONS FOR DOWNWARD DEPARTURES.

Downward departures from the applicable advisory sentencing guidelines are

warranted on multiple grounds.[1]

### A.    Overstatement of Criminal History - U.S.S.G. § 4A1.3(b)

U.S.S.G. § 4A1.3(b) provides, "If reliable information indicates that the

defendant's criminal history category substantially over-represents the seriousness of the

defendant's criminal history or the likelihood that the defendant will commit other crimes,

a downward departure may be warranted." In the event that the terrorism enhancement

were applied, the Court should apply a downward departure for Mr. Masood's criminal

history category to I. A Category VI would greatly over-represent Mr. Masood's criminal

history where he actually has **no** prior criminal history.  The record further indicates that a

lack of likelihood that Mr. Masood will commit other crimes. He previously had a

respectable professional career and a law abiding life. This offense was an aberration.

Multiple forensic psychological and psychiatric evaluations and diagnosis by mental

---

[1] Any of the stated grounds for downward departures are also grounds for downward variances.

health providers at Sherburne County jail document that Mr. Masood suffers from serious

mental health issues which had a substantial influence on his commission of the offense.

His offense occurred in response to unique situational issues where he was physically and

culturally isolated, lack his usual family support system, and was not being treated or

medicated for his mental illness. Mr. Masood has since undergone extensive mental

health treatment, takes appropriate medication, and has sufficient self-awareness so that

he will not allow himself to end up in such a situation again. The enhancement of Mr.

Masood's criminal history category in this case in not justified and does not serve the

purposes of the enhancement.

Regardless of whether or not the terrorism enhancement is applied, Mr. Masood

should further receive a downward variance of two points based on an amendment to the

Sentencing Guideline, consisting of a new guideline provision,  § 4C1.1 which goes into

effect on November 1, 2023. This provision provides for a 2 level downward adjustment

for defendants with zero criminal history points.  Mr. Masood has no prior criminal

convictions and therefore has not criminal history points. He should therefore receive the

benefit of this reduction.

**B.**      **Mental and Emotional Conditions.**

 U.S.S.G. §5H1.3 provides, "Mental and emotional conditions may be relevant in

determining whether a departure is warranted, if such conditions, individually or in

combination with other offender characteristics, are present to an unusual degree and

11

distinguish the case from the typical cases covered by the guidelines." The multiple psychological and psychiatric evaluations and diagnoses of Mr. Masood referenced above demonstrate that his mental and emotional conditions are present to an usual degree and distinguish Mr. Masood from other cases.  A related departure is also appropriate based on childhood trauma under  U.S.S.G. §5K2.0. Courts have approved such downward departures based on the psychological effects of childhood difficulties that are extraordinary.  United States v. Decora, 177 F.3d 676 (8th Cir. 1999)(upheld a downward departure under §5K2.0 based in part on the adversity the defendant faced from growing up on a reservation in South Dakota) ; Unitd States v. Roe, 976 F.2d 1216 (9th Cir. 1992)(held that the district erred in finding that the psychological effects of child abuse were not extraordinary, thereby warranting a departure under §5H1.3). As the PSR documents, Mr. Masood grew up on a dysfunctional, emotionally unhealthy and abusive childhood setting. This included abuse by his father as well as an incident of early childhood sex abuse.  (PSR, paras. 57-59, 61). The combination of his mental illness and childhood trauma justify a downward departure.

### C.  Diminished Capacity.

U.S.S.G.  §5K2.13 provides that "A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." §5K2.13 encompasses both emotional illnesses and mental

abnormalities, or "both organic dysfunction and behavioral disturbances that impair the formation of reasoned judgments." United States v. Cantu, 12 F.3d 1506, 1512-1513 (9th Cir. 1993).   A departure under this policy "does nor require proof amounting to but-for causation" but only that the diminished capacity is "a contributing factor in the commission of the offense." United States v. Ruklick, 919 F.2d 95, 97-98 (8th Cir. 1990).   The two BOP reports conclude that Mr. Masood had suffered from significantly reduced mental capacity. The two forensic reports by a psychologist and psychiatrist retained by the defense which are being simultaneously submitted further diagnose Mr. Masood with mental illnesses and conclude or support the conclusion that his diminished mental capacity substantially contributed to the offense. In summary, he suffered from depression and/or biploar disorder. Due to Mr. Masood's isolated and otherwise adverse situation, and the lack of treatment for his conditions, Mr. Masood made severe misjudgments about his situation and how to respond.

Psychologist Mary Kenning explains,

> It appears that in his [Masood's]  contact with the law enforcement agents in this matter, from a psychological perspective, he was seeking release from significant anxiety about his situation as well as a way to assert his religious beliefs. It seems likely that he was suffering from his diagnosed mental illnesses (depression and anxiety) at the time. Depression and anxiety are well known to impair rational decision making.

(Kenning Report at 11). Psychiatrist Ronald Schouten, who has specific experience in studying, writing about, and serving on committees relating to terrorism, concludes, "Dr.

13

Masood's interactions with the CHSs can best be understood, not as an act of devotion to violent extremism and the aims of ISIS, but as a consequence of his mental illness and multiple stressors." (Schouten Report at 23; Schouten CV at 3, 5, 6, 13, 15, 16. 18, 20). Dr. Schouten made the following diagnoses of Mr. Masood:

> - Bipolar II Disorder, with recurrent episodes of major depression with psychotic features
> - Other specified anxiety disorder with features of social anxiety, generalized anxiety, and somatic concerns
> - Unspecified personality disorder with dependent features

(Schouten Report at 23).

There is overwhelming documentation that Mr. Masood has suffered from serious mental illness which includes psychotic episodes. He was diagnosed with serious mental illness in Pakistan which at some point required hospitalization and at another time resulted in a recommendation of hospitalization. (PSR paras. 76-77). Mr. Masood was diagnosed with mental illness or psychological disorders by two BOP psychologists assigned to evaluated his competency and restoring his competency respectively. (PSR paras. 81-83). He was in fact found to be incompetent earlier in the court proceedings. Mr. Masood has further been diagnosed with mental health conditions and given medication and therapy by mental health providers in the Sherburne County Jail. (PSR para. 84). The conclusions of the two forensic evaluators that Mr. Masood was suffering from mental illness at the time of his offense, and his mental illness was a substantial factor contributing to his commission of the offense, are based on sound reasoning and a

14

thorough review of available evidence. A downward departure based on Mr. Masood's diminished capacity is strongly justified.

### D.   Aberrant Behavior.

U.S.S.G.  §5K2.20 provides, "The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." These requests are met in this case. Mr. Masood did not himself engage in any significant planning but relied on the FBI informants to plan his actions. His plans appear to have taken place over the course of less than two months. Mr. Masood clearly led a law abiding life prior to the incident where he had successfully completed secondary and professional education which culminated in a medical degree, received training and pursued employment as a physician, and then as a medical researcher.  As a medical student and physician in Pakistan, Mr. Masood did volunteer work in medical camps and helping poor people in rural areas who lacked medical care. (PSR para. 93). There is no indication of any sort of illegal, anti-social or harmful behavior prior to the offense. or after Mr. Masood's arrest. Mr. Masood has completed 188 hours of educational courses in the Sherburne County Jail through July and gone through multiple therapy programs. (See simultaneously filed sentencing materials). His offense was an isolated incident which

does not reflect his character or overall conduct, and therefore warrants a downward departure.

## V.    APPLICABLE § 3553(a) FACTORS WARRANT A SENTENCE BELOW THE ADVISORY SENTENCING GUIDELINES.

Mr. Masood's mental illness and its influence on his offense, other cultural and situational factors contributing to his offense, his post-offense rehabilitation, the lack of any threat of danger that he poses to the community, the hardship of extended pretrial detemtion are all factors that justify a downward variance from the advisory sentencing guidelines based on the applicable "reasonableness" factors set forth in 18 U.S.C. § 3553(a), particularly if the terrorism enhancement is applied.  18 U.S.C. § 3553(a) provides that "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  After calculating the guidelines, a district court "may not presume that the Guidelines range is reasonable" but must make an independent assessment of the  18 U.S.C. § 3553(a) factors based on the individual facts of the case.  Gall v. United States, 128 S.Ct. 586, 597 (2007).

Section 3553(a) sets forth the following factors that must be considered by a sentencing court in imposing every sentence:

>    *(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;*

Mr. Masood is deeply remorseful, regretful and embarrassed about his offense. Fortunately he did not end up causing any harm. Although the government could argue that no harm was caused because the FBI arrested him, it is also reality that it is highly unlikely that Mr. Masood would have ever made any plan to join the Islamic State without the responsiveness and assistance of the FBI informants.  Mr. Masood's driving motives were to be able to provide medical care to those in grave need and to escape the scorn of his father. The government's concern and determination to prevent people from supporting foreign terrorist organizations is understood, but the context of the specific case must be taken into account. In this specific case, Mr. Masood was not motivated by a desire to cause harm and his thinking was greatly tainted by his mental illness and his difficult personal struggles at the time.

As explained in Section IV.C, supra. Mr. Masood's mental illness played a substantial role in his commission of the offense. The combination of his circumstances which included social and cultural alienation and isolation, his failure to pass the medical licensing examination and the failure of his marriage, and his mental illnesses  rendered him unable to rationally or effectively handle his situation.  Mr. Masood's initial plan for "escape" by providing medical care through an NGO was legitimate and admirable. After that plan led to yet more failure, Mr. Masood became desperate to the point where he embraced the proposal of an undercover FBI informant to join IS.

While the two forensic examiners have thoroughly laid out how Mr. Masood's actions were the result of his situational circumstances and mental illness. they have also explained how Mr. Masood does not pose any future danger to the community.  Dr. Kenning notes, "In the past several months [as of December, 2022] Mr. Masood appears to have recovered significantly from his depression and anxiety." (Kenning Report at 11). Dr. Kenning further observes,

> Mr. Masood's history and general orientation has been one of passivity, dependency, and underfunctioning in times of crisis. He does not appear to have a long history of radical religious beliefs. Likewise, he does not have a reported history of aggression or violence toward others. The behaviors outlined in the criminal complaint seem a significant departure from his characteristic manner. This is perhaps related to outside influences whose reach he did not recognize at the time and his own unrecognized sense of desperation about his family and career situations. Other than his mental health issues, he has no history of risk factors typically associated with violent behavior. Mr. Masood has generally shown a positive response to mental health treatment interventions including therapy and medication. Depression and anxiety are both very treatable disorders. There appears to be good reason to believe that he can be successfully treated in a relatively short space of time as he seems to have made progress in the past year. From a clinical viewpoint, incarceration may negatively affect his recovery and rehabilitation process.

(Kenning Report at 12). Dr. Schouten similarly concludes,

> Dr. Masood poses a low risk of recidivism regarding the current charges or of committing an act of violence against the United States or its citizens. He has no history of violence, other criminal behavior, or substance abuse. He is trained as a physician and wishes to return to the practice of medicine, thus providing a meaningful, realistic path for his reintegration into society.

(Schouten Report at 24).

Mr. Masood's post-arrest rehabilitation consisting of extensive mental health treatment also provides grounds for a significant downward variance. See United States v. Shy, 538 F.3d 933, 938 (8th Cir. 2008)("The district court properly considered Burton's rehabilitation after her initial arrest and before her indictment" which justified a "significant" downward variance from prison to probation); United States v. Hubel, 625 F.Supp.2d 845, 852-54 (D. Neb. 2008)(completion of in-patient drug treatment justified downward variance from prison to time served.)  Mr. Masood has completed at least five psychological therapy groups in the Sherburne County Jail ranging from six to ten weeks long. (PSR para. 84; letters from therapists filed simultaneously with this memorandum). He has also completed 58 educational courses offered at the jail for a total of 188 hours through July, 2023. (See simultaneously filed educational transcript). These courses range in subject matter from addressing mental health issues to practical skills. (Id.)  Mr. Masood's extensive engagement in therapy and education evinces his determination to address his problems which led to his offense and to become a changed person. It is further evidence of the lack of danger that he poses.

    *(2)    the need for the sentence imposed–*

        *(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

        *(B)    to afford adequate deterrence to criminal conduct;*

        *(C)    to protect the public from further crimes of the defendant; and*

>       (D)     to provide the defendant with needed educational or
>               vocational training, medical care, or other
>               correctional treatment in the most effective manner;

The advisory sentencing guidelines applicable without the terrorism enhancement of 46-57 months will meet the considerations set forth in this sub-provision. A sentence of four years in prison is substantial, particularly for a Defendant who has no prior criminal history, is vulnerable to bullying and extortion and has indeed been bullied as a school child and in jail.[2] Mr. Masood's 3 1/2 years already spend in jail is sufficient to provide just punishment given his circumstances, deter him from committing any more crimes and to protect the public. As previously explained, Mr. Masood no longer presents any danger to the public. His offense was an aberrant deviation from his normal character and conduct. He has undergone extensive therapeutic treatment and reflection so that he is in a position to cope with his mental illness and continue his previously law abiding life. Mr. Masood is under a deportation order and will be removed from the United States as soon as he completes his prison sentence. Little if anything will be accomplished by continuing to keep Mr. Masood incarcerated.

An error in the PSR which must be corrected is the belief that "The primary concern of the courts in sentencing extremist offenders is 'disengagement' through incarceration as a means of protecting the public" and thereby justifying a maximum

---

[2] See Forensic Report of Dr. Robin Watkins finding incompetency at page 5 discussing bullying in school, and pages 9-10 of documenting bullying and physical assaults by other inmate in BOP facility

sentence due to "terrorists and their supporters" being "unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." (PSR para. 123 (citing United States v. Ali, 799 F.3d 1008, 1031 (8th Cir. 2015)). This statement is gravely erroneous because 1) it does not apply to Mr. Masood, and 2) it has been refuted by numerous recent professional studies. Mr. Masood is neither a terrorist nor a supporter of terrorism. He had no history of any interest in or support for terrorism prior his month or two of involvement in the offense. He has not expressed any support for terrorism since his arrest.

Dr. Schouten, who has a specialization in studying terrorism, attributed Masood's actions not to ideology but to the affect of mental illness on his personal circumstances, while observing, "Dr. Masood does not appear to be devoted to ISIS or other violent extremist ideology." (Shouten Report at 24). Dr. Kenning, as quoted above, also found that Mr. Masood did not have a history of radical religious beliefs, or aggression or violence towards others, and his behaviors in the offense were a significant departure from his normal character. (Kenning Report at 12). Mr. Masood does not pose any danger to society that warrants long-term incapacitation.

In addition to the assertion about the need for long-term incapacitation being incorrect as to Mr. Masood, it is also incorrect as a general matter. The claim that persons convicted of terrorism offenses, or in this case a terrorism-related offense, pose a likelihood of recidivism and cannot be rehabilitated is unsupported by any data. More

21

significantly these statements have been disproven by multiple recent scientific studies

which establish that the rate of recidivism in terrorist case is extremely low to non-

existent. <u>See e.g.</u> Hodwitz, O., "The Terrorism Rates Recidivism Study (TRS): Examining

Recidivism Rates for Post-911 Offenders," Perspectives on Terrorism, Vol 13, Issue 2

(2019); Hodwitz, ""The Terrorism Rates Recidivism Study (TRS): An Update on Data

Collection and Results," Perspectives on Terrorism, Vol 15, Issue 4 (2021);  Renard T.,

"Overblown: Exploring the gap between the fear of terrorist recidivism and the evidence."

2020. CTC Sentinel; 13 (4): 19-29; Altier MB, Thoroughgood C, Horgan, JG Turning

away from terrorism: Lessons from psychology, sociology, and criminology. 2014.

Journal of Peace Research; 51(5) 647-61; Altier MB, Horgan JG, Thoroughgood C.

(2012); "Returning to the Fight: What the Literature on Criminal Recidivism Can

Contribute to our Understanding of Terrorist Recidivism" (Department of Homeland

Security,

2012), https:// www.dhs.gov/sites/default/files/publications/942_OPSR_TP_Returning-to

Fight_Literature-Review_508.pdf; Silke A, Morrison J., "Re-offending by released

terrorist prisoners: Separating hype from reality." ICCT Policy Brief. International Centre

for Counter Terrorism: The Hague. Netherlands (2020).[3]

It has been objectively demonstrated in multiple studies that the rated of recidivism

of person convicted of terrorism-related offenses is extremely low. The nature of the

---

[3]    Pertinent articles are also attached.

offense therefore does not provide justification for a long incarceration. The terrorism enhancement under the guidelines is particularly out of date and contrary to available data. Mr. Masood, who has no history of violence, did not have any genuine intention to engage in violence or support violence, and has no attachment to extremist ideology, certainly does not warrant long-term incapacitation.

There further not indication that the BOP has available programming or treatment to address Mr. Masood's issues. Although the PSR asserts that "targeted intervention" is necessary for Mr. Masood's "deradicalization" and that "BOP can provide his psychiatric treatment needs," it provides no explanation of any programming or treatment specifically available that is appropriate for Mr. Masood. (PSR para. 124).  As stated, Mr. Masood is not in need of deradicalization as he does not subscribe to extremist ideology. Dr. Kenning addresses Mr. Masood's needs specifically, noting that he has responded positively to mental health interventions, that his disorders are "very treatable", and "There appears to be good reason to believe that he can be successfully treated in a relatively short space of time as he seems to have made progress in the past year." (Kenning Report at 12). Dr. Schouten recommends a combination of treatment consisting of medication and therapy which "are best obtained on a long term, outpatient basis rather than in an inpatient or carceral setting." (Schouten Report at 25). Neither Mr. Masood nor the public will benefit from extended incarceration.

*(3)      the kinds of sentences available;*

Mr. Masood already has spend almost 3 1/2 years in jail. The only question is how much more time he will be incarcerated.

*(4)      the kinds of sentence and the sentencing range established for–*

      *(A)      the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .*

See above.

*(5)      any pertinent policy statement under the Sentencing Guidelines*

See above.

*(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and*

In comparable and in more egregious cases, defendants have routinely received sentences of ten years to substantially less. Amer Alhaggagi, after his sentence of 188 months was reversed and remanded in 978 F.3d 693, received a sentence of 57 months for violation of 18 U.S.C. § 2339B. (N.D. Cal. Case No. 17-CR-387, Judgment filed on 2/3/22). Alhaggagi's support for terrorism extended to offering to purchase weapons including bomb making materials and expolisves from an FBI informant. He also received a 24 month consecutive sentence for aggravated identity theft based on using fake credit cards. In order words, his conduct was significantly more egregious than Mr. Masood's.

24

In United States v. Yusuf, No. 15-CR-46 (D. Minn.) the defendant planned to travel overseas to join ISIS and was sentenced to time served or about 12 months.

In United States v. Khan, No. 14-CR-564 (N.D. IL), the defendant was arrested when trying to board a plane to Turkey to join ISIS, and sentenced to 40 months.

In United States v. Conley, No. 14-CR-163 (D. Colo.), the defendant planned to travel to Syria to work as a nurse in an ISIS camp. She was arrested while boarding a plane, SHe was sentenced to 48 months.

In United States v. Natsheh, No. 16-CR-166 (N.D. Ca.), the  defendant was found by the FBI to be sharing ISIS propaganda online. When the FBI interviewed him, he claimed to no longer have those vides, but the FBI then discovered that he had purchased plane ticket to Turkey and arrested him while boarding the plane. He was sentenced to 60 months.


In United States v. Jumaev, No. 12-CR-00033-JLK, 2018 WL 3490886 (D. Colo. July 18, 2018), the defendant was found guilty after a trial of two counts of violation of 18 U.S.C. §2339B, and therefore did not get acceptance of responsibility, and was sentenced to time served or 76 months.

In United States v. Daniels, No. 2-16-cr-00222 (D. Ohio), the defendant was arrested at the airport where he intended to travel to Libya and join ISIS. He had

previously made a financial donation to an ISIS member and recruiter. He was sentenced to 80 months in prison.

In United States v. Wolfe, No. 1:14-cr-00213 (W.D. Tex.), the defendant attempted to travel to Syria to join IS and engage in violent Jihad, and hoped to take his wife and children. His sentence was 82 months.

In United States v. Ludke, No. 16-CR-175 (E.D. WI), the defendant pled guilty to two counts of 18 U.S.C. §2339B for agreeing to travel to Syria and Iraq to join ISIS, and pledged allegiance to the leader of ISIS.  The defendant was on probation at the time of the offense for threatening to kill a judge and bomb a federal courthouse, and cut off his ankle bracelet before leaving Wisconsin. He was a registered sex offender, had multiple felony convictions and was a criminal history category of VI without the terrorism enhancement. The government advocated for the statutory maximum sentence of 240 months. He was sentenced to 84 months.

There is little distinction between Mr. Masood's conduct and those who received lower sentences. For those above who received higher sentences, their conduct was more egregious or they had higher criminal histories. In all of the above examples, the defendants received sentences that were less than half the statutory maximum and substantially under ten years.  It does not appear that mental illness was substantial factor in most of these cases as with Mr. Masood. Mr. Masood should be compared to the above defendants in order to avoid unwarranted disparities.

(7)     *the need to provide restitution to any victims of the offense.*

This is not applicable.

## VI.   MR. MASOOD SHOULD RECEIVE AN ADDITIONAL DOWNWARD VARIANCE DUE TO HARDSHIP IN CUSTODY FROM PANDEMIC RESTRICTIONS.

The sentence for Mr. Masood should take into account the harsher conditions he has faced from being in a county jail for three years and otherwise being transported back and forth from BOP twice, and including spending approximately two years under especially harsh pandemic restriction.  Mr. Masood was arrested at about the same time that pandemic restrictions were instituted and remained in custody throughout the COVID pandemic. During the pandemic restrictions, he was been confined to his cell 23 hours per day. He was not  able to use a gym or go outdoors. Inmates were required to mostly remain in isolation in order to maintain social distancing, and were therefore deprived of meaningful human contact. During more than a year of the pandemic period, Mr. Masood did not have access to programming normally available to inmates which he was subsequently able to take advantage of including group therapy and education courses.

It is fair and reasonable to subtract time from Mr. Masood's sentence based on an assessment that the unusually long period of time he spend in pretrial confinement and particularly for the substantial time that he spend in jail or BOP facilities during pandemic restrictions. Prior to the pandemic, the Court has previously granted downward variances for time spent in Sherburne County Jail.   This Court and other courts have granted

downward variances to account for harsher time spent in pretrial custody. See e.g. United States v. Thomas, No. CR-07-2979 (DWF/JSM), 2012 WL 12896383, at *1 (D. Minn. Nov. 21, 2012), aff'd sub nom. United States v. White, 511 F. App'x 597 (8th Cir. 2013)(downward variance of 7 months to account for Defendant's pretrial custody in the Sherburne County Jail); United States v. Edmonds, No. CR-17-263(DWF/DTS), 2019 WL 4757652, at *5 (D. Minn. Sept. 30, 2019)("The Court exercised its discretion to credit Petitioner-Defendant three months for hard time served in Sherburne County"); United States v. Macfarlane, 438 F. Supp. 3d 125, 127 (D. Mass. 2020)("The Court determines that Macfarlane's two-week confinement in solitary quarantine in a higher security facility is the equivalent of two months in the Camp to which he was originally assigned.")  Mr. Masood continues to suffer a complete lack of fresh air, adequate air circulation, or adequate sunlight. Sherburne County Jail does not offer yard or outdoor access at any time.  The jail does not provide mentally or physically health conditions for a human, and offers substantially less than a federal prison. Mr. Masood respectfully requests a downward variance equivalent to 1 1/2 days for each day spent in pretrial custody.

## CONCLUSION

Fore the foregoing reasons, Mr. Masood  respectfully requests that the Court adopt his positions as to sentencing including but not limited to rejecting the terrorism enhancement, reducing the offense level based on the offense being an uncompleted

attempt. and granting downward departures or variances for overstated criminal history (if the terrorism enhancement were applied), a two point offense level reduction for lack of any criminal history based the guideline amendment to go into effect on November 1, 2023, mental illness and diminished capacity, aberrant behavior, post-offense rehabilitation, the extended time in pretrial custody including with pandemic restrictions, and the lack of danger posed by Mr. Masood.  Mr. Masood exercised severely bad judgment which was substantially attributable to his mental illness which was exacerbated by very difficult personal circumstances. Mr. Masood has since undergone treatment and gained an awareness of his mental health issues and how to cope with his issues in life effectively. He is clearly not prone to recidivism. Mr. Masood respectfully urges the Court to sensitively and thoroughly evaluate the facts, and impose a sentence that enables him to move on with his life.

Dated:  August 7, 2023                    LAW OFFICE OF JORDAN S. KUSHNER

                                          By_s/Jordan S. Kushner_____
                                              Jordan S. Kushner, ID 219307
                                              Attorney for Defendant
                                              431 South 7th Street, Suite 2446
                                              Minneapolis, Minnesota  55415
                                              (612) 288-0545