PERSPECTIVES ON TERRORISM                                                    Volume 13, Issue 2

# The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders

by Omi Hodwitz

*Abstract*

*This study examines recidivism rates of offenders convicted of terrorism-related offenses post-9/11 in the United States (N=561). In total, nine offenders recidivated while incarcerated or upon release. Of the 247 who were released during the course of the study, four recidivated. This indicates a recidivism rate of approximately 1.6% among released political extremists. These findings suggest that restrictive policies designed to increase surveillance of released political extremists, such as the recently proposed TRACER Act and other registry-based measures, are unwarranted.*

**Keywords**: Terrorism, recidivism, database, policy implications

## Introduction

In May of 2017, John Rutherford, a Congressperson from Florida, introduced H.R. 2471, the Terrorist Release Announcements to Counter Extremist Recidivism Act (TRACER Act).[1] The TRACER Act requires that, when an individual convicted of "a federal crime of terrorism" is released from a federal facility, the Secretary of Homeland Security notify all local, state, and federal law enforcement agencies.[2] In September of 2017, the House passed the TRACER Act; however, as of the beginning of 2019, the Senate has not yet taken up the measure.

The TRACER Act reflects a mounting concern among legal authorities. Following the events of September 2001 (9/11), Congress enacted several legislative measures, such as the USA PATRIOT Act and the Homeland Security Act, designed to facilitate the detection of terrorist activities, deter individuals from engaging in violent extremism, and punish those that become involved in terrorism. This led to a considerable post-9/11 increase in terrorism-related convictions in the United States.[3] A recent 2017 Department of Justice report noted that, between 9/11 and the end of 2016, approximately 550 individuals had been convicted of international terrorism-related offenses in federal courts; this number increases when the parameters are broadened to include domestic terrorism and non-federal courts.[4] Many of these individuals are incarcerated in facilities located around the United States; for example, as of October 2015, the Bureau of Prisons (BOP) was reportedly holding approximately 350 people with ties to international terrorist groups.[5]

The increase in convictions and incarcerations may appear reassuring; this suggests legislative measures are improving law enforcement's capability and capacity to detect and intercept terrorist activities. However, this trend also presents law enforcement with a new challenge: preparing for and responding to the release and potential recidivism of a unique group of offenders. As noted by academics, media sources, and legislators alike, very little is known about recidivism among individuals convicted of terrorism-related offenses.[6] While reliable recidivism metrics exist for the apolitical offending population, they are notably absent for political extremists.[7]

Prior to 9/11, counter-terrorist legislation was limited, law enforcement was focused on other issues, and convictions and incarcerations were minimal.[8] In addition, state and academic interest and funding for terrorism studies and policy analysis were virtually non-existent.[9] This collection of factors resulted in a notable deficit in research exploring recidivism rates among offenders convicted of terrorism-related activities. Post-9/11, the increase in identified offenders offers researchers the opportunity to correct this deficiency of results; however, the legal and research communities have not, as of yet, begun the task of systematically exploring recidivism patterns among politically-oriented offenders. The assumption is that the "recidivism

rate among violent extremist offenders within the U.S. is unlikely to be zero", but what that rate may be is currently unknown.[10] This continuing dearth of information is, at least in part, due to the fact that policy-related studies often require a lengthy period of time following implementation before meaningful analysis can be carried out, particularly when assessing recidivism. Once a policy has been implemented, recidivism analysis can only occur after enough time has passed for a sizeable sample of offenders to be identified, arrested, convicted, sentenced, incarcerated, released, and liberated long enough to recidivate. Given that U.S. counter-terrorism legislation is, for the most part, less than two decades old at the time of writing this article, it is no surprise that researchers have not yet presented an impressive array of empirical findings. The scarcity of recidivism information is not isolated to the United States; other Western democracies also lag in the study of terrorist recidivism, leaving policy makers and practitioners with little guidance regarding expectations of post-release behavior for extremists, both locally and internationally.[11]

When discussing recidivism, it is important to note that, although religiously-motivated terrorism is subject to increased scrutiny in a post-9/11 world, other ideologues inspire terrorist action globally and historically. Nationalism, environmentalism, and right wing terrorism are but a few examples of the non-religious motivations that facilitate violent extremism.[12] Despite the diversity in ideology, contemporary conversations regarding recidivism have tended to focus on religious communities. Perhaps this is due to the assumption, as stated by Pluchinksy in an early article discussing potential recidivism in jihadist communities, that "terrorists with a secular motivation and goal are more likely to be reformed in prison than terrorists who are driven by religious grievances." [13] As such, the few deradicalization programs implemented in countries around the world, including Saudi Arabia, Singapore, Egypt, and Yemen, tend to focus on theologically-oriented transitions in beliefs and motivations.[14] Results suggest some promise for religiously-oriented deradicalization programs, but do not directly address recidivism among political offenders, particularly those adhering to secular ideologies.

In the absence of empirical direction, legislators and law enforcement are faced with a difficult decision; should they adopt the position that politically-motivated offenders are similar to apolitical offenders in their post-release behavior or should they assume that political offenders are atypical? If the latter, should expectations lean towards an optimistic or pessimistic outlook on the potential for recidivism? Although there has been limited legislative action, the tides seem to be turning towards the assumption that political offenders are atypical and, in the absence of contradictory evidence, that they are more dangerous upon release than apolitical offenders. Congressperson Rutherford's TRACER Act, which has been likened to a sex offender registry in its blanketing reporting procedures, demonstrates this pessimistic proclivity.[15] In addition, legislators in Florida, Louisiana, and Missouri are introducing similar bills in their own states. Other government representatives have also suggested measures that align with this sentiment. For example, Richard Clarke, a former National Security Council advisor, advocated for the implementation of a team of parole officers with special training to monitor released individuals convicted of terrorism-related offenses.[16]

There is a strong argument to be made in favor of assuming the worst outcome for politically-motivated releasees. Terrorism is a devastating activity that disrupts and destroys local and global communities and, therefore, it may be prudent to adopt any and all measures designed to decrease politically violent recidivism. In addition, extremists often carry out their activities with the express purpose of achieving a common goal and experts have hypothesized that this kind of ideological orientation may make reformation or deradicalization difficult.[17] Lastly, in the post-9/11 world, terrorism-related incarcerations have increased dramatically, not only in the United States but also around the world, leading to large politically motivated prison populations that have no historical counterpart with which to compare. In light of the serious consequences of terrorism, the decreased potential for offender rehabilitation, and the burgeoning extremist prisoner population, measures such as the TRACER Act that aim to curb extremist recidivism should be considered. However, the situation is not so simple and experts have offered a counter-perspective. Critics of the TRACER Act and similar measures posit that individuals who have completed their sentences and repaid their debt to society should not be penalized further but, instead, should be treated in a manner similar to apolitical releasees. Karen Greenburg from the Center of National Security at Fordham University, for example, states, "I do not distinguish them as any more

dangerous than other people…who were convicted of committing a crime."[18] In the absence of information suggesting high rates of recidivism, proponents of this position argue for equal treatment or a presumption of reformation of political releasees.

In sum, opinions regarding recidivism rates for politically-motivated releasees tend to originate from two opposing camps; those that assume a high likelihood of recidivism and, as such, advocate for extreme post-release measures, and those that champion a presumption of reformation and advocate for traditional post-release actions. Regardless of which perspective dominates the social and political narrative, proponents of both sides will likely agree that policy and practice should be evidence-based and, to this point, the lack of informative evidence regarding recidivism is a major shortcoming of any legislative action. This is particularly problematic when considering the projected number of offenders that are scheduled to be released within the next two decades.[19]

This article is an attempt to provide empirical evidence regarding recidivism for this unique population of offenders. It introduces the Terrorism Recidivism Study (TRS), a database collected with the sole purpose of filling in some of the blanks regarding recidivism rates and characteristics of individuals convicted of terrorism and terrorist-related offenses in the United States following 9/11. The article begins with a brief overview of the TRS data collection and coding strategies, followed by a descriptive narrative of the population of interest. It concludes with an assessment of recidivism rates, recidivist characteristics, and a discussion of policy implications stemming from TRS results.

### *Data Collection and Coding*

The TRS is the byproduct of an informal conversation from 2016, during which a state representative disparaged the fact that there were a number of politically-oriented offenders ("terrorists") scheduled to be released within the next few years and law makers and enforcers alike were concerned that they did not know what to expect from these offenders. What to expect is, in part, a data-related question but, at the time of the noted conversation, the data did not exist. That, however, is not difficult to remedy with the right resources, such as court records and media reports, to name but a few. The TRACER Act further highlighted the pressing need to assess extremist recidivism and, shortly after Congressperson Rutherford introduced the Act, researchers began data collection for the TRS.

The TRS data are collected from a variety of sources, including offender datasets, state arrest records, Department of Justice (DOJ) records, and media sources. Researchers began by identifying potential offenders included in other datasets, including *The Intercept's Trial and Terror* dataset, the *Global Terrorism Database*, and Charles Kurzman's *Muslim-American Violent Extremism* data. In addition, researchers used a number of internet-based search terms to identify other cases for inclusion.[20] The goal of the TRS investigators was to identify as complete a population of offenders convicted in the United States between 9/11 and the beginning of data collection as possible. In order to accomplish this goal, multiple researchers cast a wide net, adjusting search terms, locating additional datasets that were directly or marginally related to political violence, scouring them for mention of offenders, and reviewing case files.

Once a near-exhaustive pool of potential terrorism-related offenders was collected, researchers reviewed reputable media sources and state and federal arrest and court records to confirm the existence of each case and to identify potential co-defendants. No case or offender was included in the TRS unless validated by two or more credible sources. In total, researchers flagged 848 cases between September 11, 2001, and March 6, 2018.[21] Each case was then compared to a set of exclusionary factors and, if any factors were met, the case was removed from the dataset. These included cases that resulted in deportation, those that were originally linked to terrorism-related activities but were later processed as non-political crime, offenders that passed away during criminal justice proceedings, and arrests that did not result in convictions. This produced a set of 561 recidivism-eligible individuals convicted of terrorism-related offenses in the United States between September of 2001 and March of 2018.

Once individuals were identified, coders began the careful process of documenting key information for each case. In total, the TRS consists of 58 variables grouped into five thematic categories: demographic characteristics, event description, arrest/conviction/sentencing information, release details, and reports of recidivism. Coders once again relied on credible media sources and legal records to confirm and code the details of every person included in the TRS. Table I provides a list of variables included in each thematic cluster.

*Table 1: Thematic Clustering of Variables Included in the TRS*

| Demographic Characteristics | Event Description | Arrest, Conviction, and Sentencing Information | Release Information | Recidivism Information |
| --- | --- | --- | --- | --- |
| Name and aliases | Event summary | Arrest date and charges | Date of release | Record of recidivism (y/n) |
| Age at time of conviction | Organizational affiliation | Convictions and date of convictions | Supervised release (y/n) and length of release | Record of post-release recidivism (y/n) |
| Gender | | Disposition plea | Probation (y/n) and length of probation | Recidivism summary |
| Race | | Imprisonment (y/n) and length of imprisonment | Fine (y/n) and amount of fine | |
| Prior criminal record | | Correctional institution name, location, and level of security | | |

## Sample Description

The first thematic cluster consists of offender demographic characteristics. The majority of the sample is male (93%), with an average age of 35.8 years (minimum of 17 years and maximum of 77 years). Most offenders are white (64%), followed by Afro-American offenders (24%), Asian offenders (8%), and other offenders (4%; this category includes Native Americans or Alaskan Natives, Latinos, and Pacific Islanders). It is interesting to note that the demographic characteristics of the TRS sample are nearly identical to what is observed in the apolitical incarcerated population in the United States. According to the Bureau of Prisons (2018), the federally incarcerated apolitical population is, on average, 35.2 years old and is 93% male. Racial distribution differs somewhat in the apolitical sample; the majority of incarcerated offenders are white (58%), followed by black (38%), and Asian (1.5%). The political and apolitical groups result in the same overarching profile: white male offenders with an average age in the mid-thirties.

The TRS also included information about offenders' prior criminal records. In total, 17 of the sample had a prior criminal record at the time of their terrorism-related arrest. Detailed information was missing for a little less than half of these cases, so the descriptive value of this variable is limited.[22] Bearing that in mind, there were 10 cases for which information could be located. These offenders had diverse criminal records, ranging from drug charges, robbery and assault, marriage fraud, firearm possession, and lewd and lascivious acts with a minor.

The event description cluster includes, among others, variables reporting the state where the offense occurred, whether the offender has ties to a known terrorist organization, and the types of activities the offender was accused of committing. Terrorism-related events occurred in 38 states and the District of Columbia, although the majority of offenses were localized in a handful of key states. New York bore the lion's share of TRS offenders with 137 in total or 24% of the full sample, followed by Florida and Virginia (each were host to 49 offenders or 9% of the sample), California (42 offenders or 7%) and Michigan (38 offenders or 7%). Of the 561 individuals included in the TRS, 125 had known ties to a terrorist organization.[23] The top-ranking organizations are as follows: 36 individuals were affiliated with Hezbollah, 27 were associated to Al-Qaeda, 14

had ties to the Islamic State, and 12 were linked to Fuerzas Armadas Revolucionarias de Colombia (FARC).[24] The individuals included in the TRS sample were accused of a variety of activities ranging from intent to use weapons of mass destruction through to the false use of a passport, but the common theme among the sample was non-violent financially-oriented crimes. More than half of the sample were accused of multiple offenses, making descriptive analysis difficult, but several activities appeared frequently, including providing material support, fraud, and racketeering.

The bulk of the TRS variables fell into the arrest/conviction/sentencing cluster. The arrest variables overlap considerably with the event description cluster summarized above resulting in a high number of non-violent financially-oriented offenses. Figure 1 reports the years offenders were charged for their offenses, which trended upwards following 9/11 and has remained relatively high ever since.

*Figure 1: Annual Count of Terrorism-Related Charges*



Regarding disposition, three quarters of the sample pleaded guilty and one-quarter were found guilty by a judge or jury following legal proceedings. For the most part, the convictions were similar in content to the arrests; the most common occurring convictions included fraud, providing material support, and making false statements. For those that were incarcerated, the average length of the sentence was 12.9 years and most offenders were placed in medium- or minimum-security prisons.[25]

Figure 2 reports the years of release for TRS offenders. Approximately half of the TRS sample were released from prison (247 individuals or 44% of the sample) while, as of March 2018, 241 or 43% of the sample remained incarcerated. Release information was not available for 72 individuals or 13% of the TRS offenders. Approximately 62% or 348 offenders received supervised release with an average of 8.1 years per offender. Total fines for the sample equaled 75 million dollars, which averaged out to $490,000 across the 157 individuals that received fines.

*Figure 2: Annual Count of Terrorism-Related Releases*



## Recidivism

The goals underlying the collection of the TRS are two-fold: the primary goal is to examine the rates of recidivism for individuals convicted of terrorism-related offenses in the United States following 9/11 and, depending on recidivism rates, a secondary goal is to identify factors that separate political recidivists from a matched sample of apolitical recidivists. Addressing the first goal illustrates the futility of the second goal. Out of the 561 offenders included in the TRS, *only nine recidivated over the entire period of analysis.* In other words, only 1.6% of the TRS sample recidivated between 2001 and 2018. Eight of the recidivists were men, seven were white, and their ages ranged between 19 and 46 years. Original convictions for the recidivists were a mixture of non-violent and violent offenses, including fraud, material support, firearms possession, conspiracy to commit murder, and using weapons of mass destruction. All had been incarcerated for their original convictions, with an average sentence of 16.3 years and all who had been released had been granted supervised release, with an average of 5.2 years of supervision. All had a history of organizational affiliation, including Al-Qaeda, the Taliban, the Islamic State, Hezbollah, and Al-Fuqra.

In addition to the low rates of recidivism, it is also noteworthy that five of the recidivists reoffended while still incarcerated, dropping the total number of released recidivists to four. Those that reoffended in prison were charged with attempted murder and attempting to radicalize others.

*Table 2: Post-Release Recidivist Descriptions*

|  | Offender Characteristics | Original Conviction | Original Sentence | Recidivist Event | Recidivist Outcome |
|---|---|---|---|---|---|
| Offender 1 | White male<br><br>Affiliated with the Islamic State | Providing material support or resources to designated foreign terrorist organization | Five years imprisonment and fifteen years supervised release | Violated plea agreement by using the internet | Remanded to twelve weeks in a halfway house |
| Offender 2 | White male<br><br>Affiliated with Hezbollah | Aiding and abetting fraud | Two years and nine months imprisonment and three years of supervised release | Committed fraud by illegally buying food stamps | Reincarcerated for two years |
| Offender 3 | Black female<br><br>Affiliated with Al-Fuqra | Possession of firearms and conspiracy to defraud the government | One year and three months imprisonment and two years of supervised release | Convicted of forgery and uttering | Reincarcerated for unknown length of time |
| Offender 4 | White male<br><br>Affiliated with Al-Qaeda and the Taliban | Conspiracy to solicit murder, conspiracy to make threatening statements, and conspiracy to use the internet to place others in fear | Eleven years and six months imprisonment and three years of supervised release | Parole violation due to drug possession | Reincarcerated for 90 days |

Only two individuals attempted murder and both incidents do not appear to be politically motivated; instead, offenders sought to eliminate witnesses or exact revenge on those perceived to be responsible for their conviction. In contrast, those who attempted to radicalize others were clearly politically motivated. As for the four post-release recidivists, this group engaged in a mix of offenses, including drug-related crimes, fraud, and conspiracy to commit murder. Table 2 provides brief profiles of the four post-release recidivists.

Given the unexpectedly low rates of recidivism, there is limited value in matching the political group of recidivists to a group of apolitical recidivists to isolate and identify potential explanatory factors. Instead, the best this author can do is superficially compare recidivism rates between apolitical offenders and political offenders. Regarding apolitical offenders, statistics vary depending on the source and level of offender. In 2016, the US Sentencing Commission reported that within eight years of release, half of a federal sample were rearrested, one third were reconvicted, and one quarter were reincarcerated.[26] In 2018, the Bureau of Justice Statistics reported recidivism rates for a sample of state prisoners, noting that within the first year, 44% of the sample had been rearrested and, within three years, 68% had been rearrested.[27] Following in the footsteps of these reports, this comparison focuses on released offenders only. A total of 247 political offenders were released between 2001 and 2018. Of those 247, four recidivated, resulting in a recidivism rate of approximately 1.6%. Recidivism and rearrest occurred between three months and three years following release, with an

average of one year and nine months and a mode of two years. To put it simply, political offenders were less likely to recidivate than apolitical offenders and, when they did recidivate, they did so in the years immediately following their release. In other words, although political and apolitical offenders are very similar in gender, age, and race, there are dramatic differences between these two groups when it comes recidivism rates and, to a lesser extent, to the length of time between release and rearrest. Of course, this comparison is based on a political sample of only four recidivists so must be interpreted with great caution.

### *Explanatory Considerations*

As summarized above, reported recidivism is exceptionally rare for US-based politically-motivated offenders included in the TRS. There are several potential explanations for this finding. A straightforward explanation is simply that individuals convicted of terrorism-related offenses are less likely to recidivate when compared to apolitical offenders. Whether the credit goes to a criminal justice system that effectively rehabilitates or deters, or to a characteristic that is prevalent in politically-motivated criminal populations that makes recidivism less attractive or realistic, the rates reported here may reflect a true anomaly characterizing political offenders.

A second explanation is that political offenders may simply take longer to recidivate when compared to an apolitical population. As noted previously, recidivism rates differ, based on the reporting agency, the level of offender, and the year of study. It is possible that political offenders require a longer observation period and, as such, a 10-year or 15-year follow-up may produce recidivism rates that are similar to what we have grown to expect from an apolitical population.

A third explanation is more troubling. Perhaps political offenders are better at disguising their activities the second time around. In other words, upon release they may reoffend at rates comparable to or greater than apolitical offenders but do so with greater care and caution so as to make their activities less discernable to legal authorities. It may be that a number of offenders listed in the TRS are currently engaged in political crime that have yet to be discovered by law enforcement. Although this is more problematic it is also the least likely explanation for recidivism rates recorded in the TRS; as described previously, authorities are more inclined to intensify surveillance of political releasees, increasing the likelihood that reoffending behaviors would be identified.

### *Policy Implications*

The TRS data project began in response to a gap in the literature and a push in policy; the goal was to provide empirical evidence that could inform policy maker and practitioner expectations regarding recidivism rates for offenders convicted of terrorism-related offenses post-9/11. Contrary to popular belief, the data indicate very low recidivism rates for political offenders, particularly when compared to apolitical offenders. As outlined above, there are a number of possible explanations for this observed outcome, resulting in a range of policy implications.

Low rates of recidivism may be due to a number of factors, including discrete reoffending, a delay in reoffending, or a lack of reoffending. If low rates are the result of discrete reoffending or recidivism that goes undetected, restrictive policies, such as the TRACER Act, that increase tracking and surveillance of political releasees are warranted. Increased monitoring would improve chances that post-release criminal activity is exposed and thwarted. However, there are two factors that undermine this argument. First, although restrictive reentry policies are not yet in place, post-9/11 counterterrorism policies, such as the USA PATRIOT Act, have already granted law enforcement agencies increased surveillance capabilities, particularly in relation to terrorism-related activities. In simple terms, law enforcement already applies rigorous surveillance of politically-oriented offenders, suggesting that low recidivism rates do not reflect a lack of detection. Second, as illustrated by the profiles reported in Table 2, surveillance of releasees seems to lead to detection of parole violations and minor offenses only. These ends do not necessarily justify the means, particularly in light of the argument presented at

the beginning of this article: in the absence of evidence pointing to escalated recidivism, politically-motivated offenders who have repaid their debt to society should be treated not differently than apolitical offenders and to fail to do so would be arguably unjust.

A second explanation for low reported recidivism in the TRS is the possibility of a lag in recidivism for political offenders when compared with apolitical offenders. The policy implications of this position are less clear. An argument could be made to implement long-term surveillance of political releasees with the expectation that reoffending would occur, although not within a timeline typical of apolitical offenders. The ethical and financial implications of long-term surveillance may be justified if evidence supported a lag in recidivism. However, the TRS data do not support this lag; of the offenders included in the TRS that were released, approximately 45% were released at least 10 years prior to the time of writing this article.[28] It seems reasonable to expect to see, even with a lag, some indications of recidivism within the first decade of release. In light of this lack of supporting evidence, long-term registry or surveillance measures are difficult to defend.

The third explanation, as outlined previously, is that the TRS reports a legitimate phenomenon: political offenders are less likely to recidivate than apolitical offenders. The policy implications for this finding are clear: restrictive measures such as the terrorism registry proposed in the TRACER Act are unnecessary and unjustified. In addition, implementing such measures may be costly on several fronts. Economically speaking, a terrorism-related registry would not oversee a large population, keeping the expenses low, but it would require some level of infrastructure, supervision, and maintenance, making the expense greater than zero. In addition, if the TRS report of low recidivism is accepted as valid and reliable, any restrictive policy would defy the evidence, delegitimizing it from the start and making it vulnerable to legal challenges. Lastly, policy makers, practitioners, and the public in the United States have demonstrated an implicit tendency to apply stereotypes and biases when discussing and assessing terrorism.[29] A registry and other surveillance protocols provide grounds for oversurveillance of racial or religious communities.

The explanations for low recidivism rates summarized above point to the need to continue to observe and build the TRS in order to determine if the reported recidivism patterns persist over time. Persistence in low rates of recidivism will provide support for the position that political offenders are less likely to reoffend, while changes in reoffending patterns may support the remaining two explanations: discrete recidivism or a delay in recidivism. It is also possible that the unique character of the offenses is a factor in assessing recidivism. As noted previously, many of the terrorism-related convictions were non-violent financial crimes; crimes that are not typically prominent in the criminal histories of apolitical recidivists. One area of future research could involve a detailed comparison of reoffending patterns of apolitical and political offenders with a history of similar convictions. A final area of future research involves a careful assessment and comparison of the risk and protective factors found in political and apolitical offending populations. For example, do political recidivists share similar risk factors as apolitical recidivists? On which factors do political recidivists and non-recidivists differ?

In conclusion, the results reported here suggest that offenders convicted of terrorism-related crimes are unlikely to recidivate and, when they do, their offenses tend to be minor violations. In light of these findings, policy measures that aim to increase tracking and surveillance of politically-motivated releasees are, at best, questionable. Measures such as the TRACER Act that propose the creation of an offender registry can incur costs on a financial, legal, and ethical level, and may have very little benefit. While extremist offenders do recidivate, these numbers appear to be so low (less than two recidivists for every 100 releasees), that it would be difficult to argue that the ends justify the means.

*About the Author*: **Omi Hodwitz** *is Assistant Professor in the Department of Sociology and Anthropology at the University of Idaho and a Research Affiliate of the National Consortium for the Study of Terrorism and Responses to Terrorism (START) at the University of Maryland. Dr. Hodwitz specializes in data collection and analysis and the role of civil society in political violence. She has published articles in Sociological Spectrum and Behavioral Sciences and Political Aggression. She has also published book chapters in Routledge and CRC edited volumes.*

*Notes*

[1] Beavers, O. (2018, September 14). US faces new challenge with pending release of terror convicts. *The Hill*; URL: https://thehill.com/policy/national-security/406631-us-faces-new-challenge-with-pending-release-of-terror-convicts

[2] The proposed Bill does not include a list of offenses that would fall under the auspices of a "federal crime of terrorism."

[3] 'Terrorism-related offenses' is a broad category that includes dozens of offenses that, although similar in content, are legally unique. It is, therefore, an unwieldly task to provide an exhaustive list of potential offenses. However, some of the more frequent convictions include: attempting to, or succeeding in, providing material support or resources to a designated foreign terrorist organization; committing an offense against the United States; fraud or related activity in connection with identification documents, authentication features, and information; harboring or concealing terrorists; making false statements; and firearms possession. Aiding and abetting or conspiring to commit these offenses are also prominent among the convictions.

[4] Department of Justice (2018, January 16). *DOJ, DHS report: Three out of four individuals convicted of international terrorism and terrorism-related offenses were foreign-born* [Press release]; URL: https://www.justice.gov/opa/pr/doj-dhs-report-three-out-four-individuals-convicted-international-terrorism-and-terrorism .

[5] Author Unknown (2015, November 5). US faces task of helping terror suspects return to society. *Chicago Tribune*; URL: https://www.chicagotribune.com/news/nationworld/ct-terror-suspects-released-20151105-story.html

[6] Altier, M.B., Horgan, J., & Thoroughgood, C. (2012). Returning to the fight: What the literature on criminal recidivism can contribute to our understanding of terrorist recidivism. *Department of Homeland Security;* URL: https://www.dhs.gov/sites/default/files/publications/942_OPSR_TP_Returning-to-Fight_Literature-Review_508.pdf ; Morton, J. & Silber, M.D. (2018, December 17). Ex-terrorists, walking the streets: We've got to get better, and quick, about reintegrating former jihadists into society. *The NY Daily News.* URL: https://www.nydailynews.com/opinion/ny-oped-ex-terrorists-walking-the-streets-20181213-story.html .

[7] The Bureau of Justice Statistics has released several reports examining recidivism rates of released offenders in the United States. Results indicate that approximately 44% are rearrested in their first year following release, 68% were rearrested within three years, and 79% were rearrested within six years, and 83% were rearrested within nine years; URL: https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf .

[8] Shields, C. A., Damphousse, K. R., & Smith, B. L. (2009). How 9/11 changed the prosecution of terrorism. In: *The impact of 9/11 and the new legal landscape* (pp. 125-144). New York, NY: Palgrave Macmillan; URL: https://doi.org/10.1057/9780230100053 .

[9] Ranstorp, M. (2006). Mapping terrorism research: State of the art, gaps and future direction. London: Routledge; URL: https://doi.org/10.1080/09546550701826360 ; Ranstorp, M. (2009). Mapping terrorism studies after 9/11: An academic field of old problems and new prospects. In *Critical Terrorism Studies: A New Research Agenda* (pp. 27-47). London, UK: Routledge; URL: https://doi.org/10.1177/00223433100470041111

[10] Morton, J. & Silber, M.D. (2018). When terrorists come home: The need for rehabilitating and reintegrating America's convicted jihadists. *Counterextremism Project;* URL: https://www.counterextremism.com/sites/default/files/CEP%20Report_When%20Terrorists%20Come%20Home_120618.pdf .

[11] Morton & Silber, "When terrorists come home: The need for rehabilitating and reintegrating America's convicted jihadists."

[12] David C. Rapoport's article on the four waves of modern terrorism provides a good summary of the evolution of terrorist ideology over time. Rapoport, D. C. (2013). The four waves of modern terror: International dimensions and consequences. In *An International History of Terrorism: Western and Non-Western Experiences* (pp. 282–311). London, UK: Routledge.

[13] Pluchinsky, D.A. (2008). Global Jihadist Recidivism: A Red Flag. *Studies in Conflict & Terrorism, 31*(3), 182-200.

[14] Noricks, D.M. (2009). Disengagement and Deradicalization: Processes and Programs. In *Social Science for Counterterrorism: Putting the pieces together* (pp. 299-322). Santa Monica, CA: Rand.

[15] Duggan, J. (2019, January 3). US terrorists to be named on sex offender-style registries in bid to prevent attacks. *The Express*; URL: https://www.express.co.uk/news/world/1066815/us-terrorists-sex-offender-type-registry-prisoners .

[16] Beavers, "US faces new challenge with pending release of terror convicts."

[17] Bertram, L. (2015). How could a terrorist be de-radicalised?. *Journal for Deradicalization*, *5*, 120-149. Webber, D., Chernikova, M., Kruglanski, A. W., Gelfand, M. J., Hettiarachchi, M., Gunaratna, R., ... & Belanger, J. J. (2018). Deradicalizing detained terrorists. *Political Psychology*, *39*(3), 539-556; URL: https://doi.org/10.1111/pops.12428 .

[18] Beavers, O., "US faces new challenge with pending release of terror convicts."

[19] According to Counter Extremism Project, 61 people convicted of terrorism-related offenses are scheduled to be released between

2018 and 2024. - Morton & Silber, "Ex-terrorists, walking the streets: We've got to get better, and quick, about reintegrating former jihadists into society."

[20] Search terms varied between cases, but the main staple terms included: terror*, recidiv*, reoffen*, crim*, arrest*, convict*, incarcerat*, sentence*.

[21] Case identification began in March of 2018 and, as a method of capping identification efforts, March 6th was selected as upper bound for case identification.

[22] This is likely due to the fact that, for many of these offenders, early criminal offenses occurred as early as the 1970s or 1980s.

[23] Offenders were coded as having ties to known organizations if this was reported in the media or in court documents. "Having ties" is an elusive term but often was not expounded upon by source reports. When sources did clarify the meaning of group affiliation, it typically referred to any of the following: pledging allegiance to an organization, claiming membership, communicating directly or indirectly with known organizational affiliates, or having an organization identify the offender as a member or active affiliate.

[24] There was a number of individuals who were affiliated with multiple organizations. For the sake of simplicity, the organization affiliations reported here exclude those cases.

[25] A portion of the sample was sentenced to life imprisonment. To calculate the average sentence, 30 years was used as a proxy for a life sentence.

[26] United States Sentencing Commission (2016, March). *Recidivism among Federal Offenders: A Comprehensive Review*; URL: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf .

[27] Bureau of Justice Statistics (2018, May). 2018 update on prisoner recidivism: A 9-year follow-up period (2015-2014); URL: https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf .

[28] In total, 247 offenders were released, although the release date for 10 of those offenders was unknown. Out of the 237 whose release date is known, 106 were released 10 years or longer ago.

[29] Corbin, C.M. (2017). Terrorists are always Muslim but never white: At the intersection of critical race theory and propaganda. *Fordham Law Review 86*(2), 455-485.