Terrorism Research Initiative

---

The Terrorism Recidivism Study (TRS)

Author(s): Omi Hodwitz

Source: *Perspectives on Terrorism*, August 2021, Vol. 15, No. 4 (August 2021), pp. 27–38

Published by: Terrorism Research Initiative

Stable URL: https://www.jstor.org/stable/10.2307/27044233

REFERENCES
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/10.2307/27044233?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

---

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Terrorism Research Initiative* is collaborating with JSTOR to digitize, preserve and extend access to *Perspectives on Terrorism*

This content downloaded from
24.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

PERSPECTIVES ON TERRORISM                                                                   Volume 15, Issue 4

# The Terrorism Recidivism Study (TRS): An Update on Data Collection and Results

by Omi Hodwitz

*Abstract*

The Terrorist Recidivism Study (TRS) database, first created in 2018, records individuals convicted of terrorism-related offenses in the United States post-9/11. The TRS is a longitudinal database, tracking offenders' pre- and post-release behavior over time. This article presents results from the most recent update to the database. Specifically, it examines recidivism rates for offenders prosecuted between 2001 and 2020 (N=629). Results indicate that 20 individuals recidivated during the study, including both pre- and post-release. Of the 354 who were released, 11 or approximately 3.1 percent re-offended. Although this is a higher rate than reported in the original 2018 data (1.6 percent), it is still significantly lower than rates found among conventional or apolitical offenders. The results support the proposition that recidivism among extremists is notably low, even with an extended period of observation, indicating that extremists may have a low propensity for re-offending.

**Keywords:** Terrorism, recidivism, database, policy

*Introduction*

On January 6, 2021, in response to the results of a contentious presidential election, citizen insurrectionists stormed the State Capitol building in Washington, DC. The attack resulted in extensive property damage, injuries, and even deaths. Over the next several months, legal authorities charged hundreds of people with terrorism-related offenses, including destruction of government property, assault on police officers, and conspiracy.[1] At the time of writing this article, these charges are still pending for several hundred defendants, many of whom were returned to the community on conditional release. The public return of alleged extremists raises concerns for legal authorities and the public alike, since the Capitol insurrectionists pose a continued threat, potentially primed to re-engage in political violence.[2]

Apprehensions about extremist recidivism are not new but instead reflect a growing concern in legislative and enforcement discussions. Following the attacks in September of 2001 (9/11) and the implementation of the USA PATRIOT Act, the United States experienced a significant increase in the arrest and prosecution of individuals for terrorism-related offenses.[3] In October of 2015, the Bureau of Prisons reported that there were approximately 350 inmates with ties to international terrorist organizations incarcerated in federal facilities.[4] This number, however, did not include those with domestic affiliations. A federal audit later revealed that the number of convicted inmates with ties to both domestic and international terrorism was much higher, exceeding 500 as of March of 2018.[5] To date, more than a few of these individuals have been released or are in the process of being released, leaving legal authorities scrambling to respond. As these offenders return to the community, their ability to reintegrate successfully is a source of concern.

Historically, the empirical evidence providing direction on the frequency and severity of extremist recidivism has been limited.[6] In addition, much of the research on this topic focused on individual case studies or program outcomes, which had limited utility when preparing for the release of aggregate numbers, many of which are without the benefit of deradicalization programs.[7] In response to the lack of data and, thus, clear evidence-driven policy prescriptions, two opposing sets of responses arose. At one end of the spectrum, legislators and practitioners advocated, in the name of public safety and security, for strict release protocols, including information sharing among agencies and enhanced supervision upon release.[8] At the other end, academics and civil experts supported an approach comparable to apolitical offenders, without enhanced security measures, citing concerns regarding civil rights and backlash effects.[9] Within the context of this legislative tension and the ongoing release of convicted extremists, the need for data addressing terrorist

This content downloaded from
34.118.41.85 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

recidivism became a matter of utmost importance.

In recent years, the research community has responded to the deficit in information, engaging in efforts designed to explore aggregate relationships between extremism and recidivism. These projects involve the creation and maintenance of large databases that track individuals convicted of terrorism-related offenses, recording and reporting incidents of re-offending behavior. The results from these various preliminary endeavors have been surprising, yet relatively consistent, regardless of the country of study, the type of offender, or the period of examination.[10]

Researchers in Europe, for example, studied a sample of 189 individuals released in the Netherlands, tracking incidents of re-offending between 2012 and 2018.[11] Just under six percent re-offended over the period of study, which contrasted sharply with apolitical offenders who reported a recidivism rate of approximately 50 percent. Similar results were replicated in Belgium with a sample of 557 jihadist-related extremists.[12] Researchers found that, between 1990 and 2019, 2.3 percent of the sample recidivated, although this number nearly doubled when suspected re-engagement was included in the analysis. Reinares and colleagues carried out a similar study in Spain, examining recidivism rates of jihadists between 2004 and 2018.[13] Approximately seven percent re-engaged with terrorism while incarcerated or after release.

Government data align with the European findings. Of 453 extremist offenders released in Northern Ireland in 1998, only five percent were rearrested within the first 13 years of release.[14] In the United States, the Director of National Intelligence reported that, as of 2019, 729 Guantanamo detainees had been released.[15] Approximately 17 percent had re-engaged with terrorist groups and activities, although this number increased to approximately 30 percent if the definition was broadened to include suspected re-engagement. In the United Kingdom, the House of Lords reported that six of 196 released extremists were reconvicted of additional terrorism-related offenses between 2013 and 2019.[16]

Overall, the collective results provide clear indications regarding recidivism rates among extremist samples in Western contexts. Although exact numbers vary, the pool of data suggests that reported recidivism is in the low single or double digits. These preliminary findings belie expectations when compared to apolitical offenders or individuals convicted for non-terrorism-related offenses, who tend to report recidivism rates between 30 and 60 percent within the first three to five years of release.[17] The discrepancy between political and apolitical re-offence rates raises important questions. Are extremist offenders simply more adept at hiding their recidivism than their apolitical counterparts? Do they have a longer period of dormancy before reengaging in crime and, thus, require a longer period of analysis to detect re-offending? Or are they simply less likely to re-offend? Determining answers to these questions can aid legislators and practitioners alike in drafting and executing policies designed to respond to extremists returning to the community. Therefore, in addition to initiating new recidivism-related data collection projects and keeping existing ones updated, it would behoove researchers to begin to delve deeper into the factors that underlie the recidivism anomaly.

Given the need for continued assessment, this author has two goals: 1) to present an update on a large data-collection project that examines extremist recidivism and 2) to examine factors that may facilitate the low re-offending rates reported in the growing body of literature on terrorist activities post-release. Specifically, this article reports findings from the Terrorist Recidivism Study (TRS), a database created at the University of Idaho that records re-offending among a sample of individuals convicted of terrorism-related offenses in the United States following the attacks on 9/11. Preliminary analysis conducted in 2018 indicated that recidivism rates were surprising low, thus lending support for the collective findings of other major data projects in Western countries.[18] However, recidivism is not a static concept best captured with cross-sectional analysis; instead, it unfolds over time, requiring continued monitoring. Therefore, this article presents the results of a second wave of data collection conducted in the summer of 2020, two years after the first wave of data collection. In keeping with the two goals listed above, this second wave of analysis serves to update readers on overall recidivism rates while also examining factors that might drive these rates, including the possibility that extremists are slower to re-offend or are potentially less prone to recidivism.

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

*Data Collection and Coding*

The first wave of TRS data collection was presented in detail in an article titled "The Terrorism Recidivism Study (TRS): Examining recidivism rates for post-9/11 offenders" but will be briefly recapped here.[19] Early TRS data collection included individuals that had been arrested and/or convicted of terrorism-related offenses between September 11, 2001, and March 6, 2018, in the United States. Cases were identified through the examination of offender and event data sets, media sources, arrest and court records, and Department of Justice records. This resulted in 848 cases that were further whittled down to 561 cases once exclusion criteria were applied. Cases were excluded if: the individual was charged with terrorism-related offenses but was convicted of a nonpolitical crime, the charges were dropped, or the offender was deported or passed away following court proceedings. In addition, each individual case required validation from a minimum of two credible outside sources, usually in the form of court records and media reports.

The 2020 TRS update followed a similar process. Records, media sources, and existing data sets were examined for new cases and additional information.[20] Data collection and coding occurred in two rounds. The first round supplemented the database with more recent cases, filling the gap between March 6, 2018 and December 31, 2019. The second round reviewed all existing cases in the database with the focus on refining variables and identifying new incidents of recidivism; recidivism was assessed through to June 30, 2020. The results of each round are described in greater detail below.

*Sample Description*

After applying the exclusion criteria, an additional 68 cases were added to the TRS, bringing the total number to 629 individuals. As described in Table 1, each new case was coded on a variety of variables grouped into five thematic categories, including demographic characteristics, event description, criminal justice proceeding variables, release information, and recidivism details. The original TRS included 58 variables; however, for the sake of a more detailed and informative analysis, the decision was made to add variables and refine several existing variables while updating the database. All cases, both new and old, were recoded to reflect these changes. New racial categories were added (*Middle Eastern and Arab, European White*), further refining the *White* and *Asian* categories and ensuring a more nuanced understanding of the role of race and ethnicity in criminal justice proceedings.[21] While recoding these variables, a concerted effort was made to prioritize personal offender accounts of racial identity over court records, resulting in what is believed to be a more accurate rendition of this demographic characteristic. A new set of variables was added that reported whether the terrorist-related crime was violent, non-violent and financially oriented, or non-violent and non-financially oriented.[22] Due to the great diversity of the convictions included in the TRS, examining sentencing and recidivism outcomes based on offense type is difficult (imagine attempting to assess the relationship between sentencing and dozens of variations of '*Providing Material Support*'). These new variables allow for a superficial but informative assessment of the role of offense type on different outcome variables. One variable was excluded; the original TRS included both *Probation* and *Supervised Release* as sentencing variables but, given the similarity in these two outcomes, they were collapsed into a single *Supervised Release* variable. These changes resulted in a final count of 70 variables distributed across the five thematic clusters.

The first set of thematically grouped variables consists of demographic and prior criminal record characteristics. The sample is majority male (92 percent) with an average age of 33.3 years at time of conviction. Nearly all the sample falls into four main racial categories, including Middle Eastern and Arab (29.8 percent), European White (27.5 percent), Afro-American (23.8 percent), and Asian (17 percent). Thirty-two of the TRS offenders had prior criminal convictions at the time of arrest, most of which were apolitical in nature. Four had previous records that could be tied to political activity, while the remaining 28 had been convicted of a mix of drug offenses, weapons offenses, assaults, gang activity, and financial crimes. Females are relatively scarce in the TRS (only 52 cases), but their racial and age characteristics are similar to their male counterparts, although females tend to be a little older (35.2 years).[23] It is interesting to note that none of the females had a prior criminal record.

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

Table 1: Variables Included in the TRS Database

| Demographic Characteristics | Event Description | Arrest, Conviction, and Sentencing Information | Release Information | Recidivism Information |
|---|---|---|---|---|
| Name and aliases | Event summary | Arrest date and charges | Released (y/n) and release date | Record of recidivism (y/n) |
| Age at time of conviction | Organizational affiliation (y/n) and description | Location of court proceedings | Supervised release (y/n) and length of release | Record of post-release recidivism (y/n) |
| Gender | | Specific convictions, general category of convictions, and date of convictions | Probation (y/n) and length of probation | Recidivism summary |
| Race | | Disposition plea | Fine (y/n) and amount of fine | |
| Prior criminal record (y/n) and description | | Sentencing date | Deportation (exclusionary criteria, y/n) | |
| | | Imprisonment (y/n) and length of imprisonment | | |
| | | Correctional institution name, location, and level of security | | |

The next set of variables relates to event description, including the location of the offense, the types of activities the offender engaged in, and whether the offender is affiliated with a known terrorist organization. Incidents occurred in 38 states and the District of Colombia, with many clustered in New York (22.8 percent), Virginia (8.4 percent), Florida (7.6 percent), Michigan and California (6.9 percent each), and Texas (6.3 percent). The majority of the sample had ties to terrorist organizations; only 17.8 percent were unaffiliated at the time of arrest or were missing a group claim of responsibility at a later date.[24] A sizeable portion of the affiliated individuals were connected to more than one terrorist group, making descriptive statistics difficult. However, for those who had only one affiliation, most were tied to Al Qaeda (20.3 percent), the Islamic State (19.8 percent), Hezbollah (9.3 percent), and Al-Shabaab and the Fuerzas Armadas Revolucionarias de Colombia (FARC) (4.7 percent each).

The majority of the TRS variables were included in the criminal justice proceedings cluster, including arrest, conviction, and sentencing information. The sample was split relatively evenly across arrest and conviction offense types; approximately one-third of the sample was arrested and convicted of violent offenses (34.4 percent), non-violent financial offenses (37.5 percent), and non-violent and non-financial offenses (27.9 percent). For violent offenses, TRS cases clustered in the *'Providing Material Support'* category, specifically for engaging in extremist-related training in weaponry and explosives, either overseas or domestically. Non-violent financial offenses tended to cluster around *Fraud* and, once again, *Providing Material Support*; both sets of offenses were related to making direct or indirect donations or fundraising through fraudulent means. Non-violent and non-financial offenses were associated with *Making False Statements* and *Providing Material Support*; these tended to be tied to misleading authorities and immigration violations.

Regarding dispositions and sentencing, 26 cases are still awaiting trial and three outcomes are unknown, so these were excluded from descriptive reports. Of the remaining 600 cases, 76.6 percent pleaded guilty and 23.4 percent were found guilty by a judge or jury. The majority of the sample was incarcerated (88.3 percent) with an average sentence length of 12.5 years. It is important to note that 29 individuals were sentenced to

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

life imprisonment and, as such, needed to be assigned a quantitative score that may not accurately reflect the duration of their sentence. Following in the footsteps of similar sentencing analyses, a score of 30 years was assigned for life imprisonment.[25] Approximately three-quarters (78.1 percent) of TRS offenders were sentenced to some form of supervised release, with an average of approximately 7.7 years. Of those sentenced to supervised release, 54 received lifetime supervision, once again making quantitative descriptions difficult. Similar to incarceration length, these individuals were assigned a score of 30 years. Lastly, 138 offenders were charged a fine or some form of restitution. The collective total of these fines equaled more than $77 million, averaging out to approximately $567,750 per person.[26] This impressive average was driven, in part, by a dozen or so cases with individual fines in the millions.

Of the whole sample, release information for 13 individuals could not be confirmed so those persons were removed from the analysis. From the remaining 616 cases, 354 or 56 percent have been released and are currently back in the community. The sample was split relatively evenly in release decades; 183 were released between 2001 and 2010 and 158 were released between 2011 and 2020. On average, approximately 17 TRS cases are released each year, with slight clustering in the tail ends of the two-decade timeline, around 2002 and 2018/19.

### *Recidivism*

As the name suggests, the primary purpose of the TRS is to assess recidivism rates among convicted extremists in the United States. For the purposes of this analysis, recidivism is defined as any criminal activity, either political or apolitical, that requires the intervention of the criminal justice system. The analysis of the 2018 data set demonstrated that recidivism is quite low among political offenders; nine individuals or approximately 1.6 percent of the full sample re-offended by the spring of 2018. In addition, only four of those nine recidivated upon release; the remainder re-offended while still in prison. Of the 247 offenders released in the 2018 data, this resulted in a consistent recidivism rate of 1.6 percent. These findings are particularly stark when compared to a non-extremist or apolitical sample of offenders. The Department of Justice, for example, examined a state sample of released offenders, reporting a 44 percent re-arrest rate within the first year and a 68 percent arrest rate in the first three years.[27]

The results from the 2018 data may be explained in one of three different ways: 1) political offenders are better at masking their recidivism a second time around, 2) they may take longer to recidivate and numbers will increase over time, or 3) political offenders are simply less likely to recidivate once processed by the criminal justice system. Although the first explanation is certainly of concern and worthy of follow-up, it is beyond the parameters or capabilities of the TRS to address it. However, the second and third explanations for low recidivism rates can be tested with regularly updated data and analysis. Therefore, the goals of this assessment of TRS recidivism are two-fold: 1) to assess if 2018 recidivisms rates are replicated with the 2020 data and 2) to determine if early releasees, when given two additional years to re-offend, have increased their rates of recidivism. The first goal allows us to test the hypothesis that political offenders are simply less likely to recidivate; if re-offense rates remain low, this supports the supposition that they are not prone to recidivate. The second goal allows us to examine the hypothesis that political offenders take longer to recidivate than apolitical offenders. If, after two additional years, early releasees have increased their recidivism rates, this suggests that they do have a slow-release re-offending pattern.

Looking first at general recidivism rates, these remain low in the 2020 data. As depicted in Table 2, out of 629 offenders included in the TRS, only 20 recidivated over the two decades of analysis, or 3.1 percent between 2001 and 2020. Of the recidivists, the majority was male (90 percent) with an average age of 31.9 years. Six were Middle Eastern and Arab, five European White, five Black, three Asian, and one recidivist was Hispanic/Latinx. Eight were convicted of violent offenses, eight of non-violent financial offenses, and the remainder fell in the non-violent and non-financial category. Their specific offenses did not differ considerably from the full TRS sample; the majority was convicted of providing material support, followed by a mix of other offenses, including fraud, firearm violations, attempting to use weapons of mass destruction, and immigration violations.

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

All of the recidivists were incarcerated as part of their conviction, averaging 15 years in prison, although it is important to note that this includes two 'lifers' whose sentences have been coded for 30 years. Fifteen were sentenced to supervised release averaging 4.9 years.[28] Seventeen were affiliated with an organized terrorist group, the majority of which were aligned with Hezbollah, Al Qaeda, and the Islamic State.

Table 2: Rates of Imprisonment and Recidivism

|  | Recidivism | No Recidivism (As of June 30, 2020) | Total (%) |
| --- | --- | --- | --- |
| Total Sample | 20 | 609 | 629 (3.1%) |
| Never Incarcerated | 0 | 96 | 96 (0%) |
| During Incarceration | 9 | 524 | 533 (1.7%) |
| Following Incarceration | 11 | 343 | 354 (3.1%) |

Of the 20 that recidivated, 11 re-offended following release and the remaining nine re-offended while still incarcerated. It is interesting to note that recidivism rates do not change when assessing the full sample (629) or the sample of releasees (354); 3.1 percent re-offended in both samples. When comparing the two groups, there are a number of expected differences. Those who offended while in prison were more likely to have committed violent offenses and received longer sentences. One observation of interest stems from previous criminal records; four of the recidivists had a criminal record prior to engaging in extremist-related behavior and three of these were in the releasee group.

At this point, there is value in returning to the first goal: examining whether recidivism rates remain low between the 2018 and 2020 TRS samples. In keeping with the Department of Justice and the Bureau of Prisons methods of assessing recidivism, the focus for the remainder of the analysis will be on *released* recidivists. As described previously, the 2018 data reported a recidivism rate of 1.6 percent while the 2020 data reports a recidivism rate of 3.1 percent. This suggests a near doubling of recidivism among the released population in the TRS, a notable finding in any analysis. However, interpretation of the difference in rates must proceed with some caution. Although the rate doubled in two years, it is still in the low single digits, represents only a handful of individuals, and remains significantly different from apolitical samples, such as those reported by the Sentencing Commission or Department of Justice.[29] Therefore, it would be wise to examine where these differences lie.

Between 2018 and 2020, seven individuals were added to the recidivist list. Although this is a significant increase in numbers, it does not necessarily reflect an expansion of recidivism but, in several cases, increased access to information for TRS coding. One recidivist, for example, fled the country years earlier while on probation and was only recently returned and processed, reflecting a delay in court recognition of recidivism. Another offender stole groceries some years ago, but her municipality only recently began providing online accounts of local criminal activity. A third recidivist has a long history of domestic abuse that predates his terrorist-related activities, but the abuse was only recently reported by his intimate partner. In other words, these incidents suggest that, although there is an increase in reported recidivism, this is due in part to reporting practices and not necessarily a more motivated recidivist element inherent in the political offender population. In other words, a careful look at the recidivist sample suggests that the increase in numbers does not necessarily support the conclusion that political offenders are more prone to recidivism than originally indicated by the 2018 data.

This shifts attention to our second goal: the examination of the hypothesis that political offenders may simply take longer than apolitical offenders and, given more time, recidivism will increase. Assessing this hypothesis entails a targeted examination of the relationship between recidivism and time of release. The appropriate method of analysis would involve comparing the TRS sample to an apolitical sample. Unfortunately, due to

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

the small number of TRS individuals and recidivists, this is not a viable option. An influential Department of Justice (DOJ) assessment of recidivism, for example, follows offenders released in 2005 and records recidivism rates for the nine years following release. In order to best match the TRS sample to the DOJ sample, the focus should be on political offenders released in the same or a comparable year, examining their behaviors for the next nine years. However, only 17 TRS offenders were released in 2005 and this reflects the annual average throughout the TRS. In addition, only one person recidivated in this small annual sample, making quantitative analysis impossible. Therefore, although the alternative is less than ideal, the next best option is simply to examine the overall trends of recidivism among the TRS sample and draw parallels between it and what is known about apolitical recidivism.

Table 3 provides a brief overview of the year of release, the year of recidivism, and the duration of time between these two dates for all released re-offenders. The first thing to note is that the distribution is skewed to the right; four out of the 11 recidivists re-offended within the first year. This skew is similar to an apolitical sample, although the prominence of recidivism in the political sample is lower.[30] Second, the average length of time for recidivism to occur was 5.3 years, suggesting a longer period of dormancy than would be expected from a typical group of offenders; however, this is a difficult metric to gauge given that the follow-up period is not uniform across all TRS offenders.[31] This would support the conclusion that political offenders do require a lengthy period of time to re-offend, but it is important to note that the distribution and average were driven in large part by two outliers; individuals released in 2002 who did not recidivate for 15 and 16 years respectively. In addition, as mentioned previously, the 16-year recidivist had been engaging in domestic violence for years, even predating his extremist activities, but the behavior was not reported by his intimate partner until recently, casting some doubt on his veracity as an outlier.

Table 3: Post-Release Recidivism

| Offender | Year of Release | Year of Recidivism | Duration between Release and Recidivism | Type of Recidivism |
| --- | --- | --- | --- | --- |
| Offender 1 | 2002 | 2018 | 16 years | Domestic violence |
| Offender 2 | 2002 | 2017 | 15 years | Minor theft |
| Offender 3 | 2003 | 2014 | 11 years | Human trafficking |
| Offender 4 | 2005 | 2005 | 1 year | Forgery |
| Offender 5 | 2006 | 2010 | 4 years | Counterfeiting |
| Offender 6 | 2007 | 2007 | 1 year | Fleeing the country |
| Offender 7 | 2008 | 2012 | 4 years | Illegal use of food stamps |
| Offender 8 | 2011 | 2018 | 7 years | Drugs |
| Offender 9 | 2015 | 2017 | 2 years | Drugs |
| Offender 10 | 2018 | 2018 | 1 year | Use of a computer (parole violation) |
| Offender 11 | 2019 | 2019 | 1 year | Driving without a license (parole violation) |

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

The type of recidivism is also important; many of the questions around terrorist recidivism are rooted in the concern that, upon release, they will re-engage in political violence. Herein lies a particularly interesting outcome. Apart from one individual, the recidivists did not return to extremist activities following release. Instead, releasees engaged in apolitical activities, including parole violations, minor theft and fraud for personal gain, drugs, and domestic violence. The one exception has a tenuous connection to political activity, at best. This offender was originally convicted of human trafficking for profit, including smuggling members of Hezbollah. He resumed his old ways upon release, reengaging with a smuggling ring. Although his involvement was driven by profit, it is possible that he continued to do business with extremist organizations although this is not documented in his second set of convictions. Thus, crediting him with continued terrorist-related activities is generous and unconfirmed. Regardless, the data provide a clear picture of apolitical recidivism. This does not exclude the possibility that future releasees will re-engage with political violence, but this expectation is not borne out in the TRS sample.

Therefore, the recidivist data suggest several conclusions. First, political offenders have significantly lower recidivism rates when compared to apolitical offenders. Second, political offenders are more likely to re-offend within the first year than in later years, comparable to an apolitical sample. Third, the distribution of recidivism is heavily skewed, reflecting a longer duration in later offending, although this appears to be driven in part by outliers. Lastly, when political offenders do recidivate, they engage in apolitical and personally motivated activities. These conclusions should be interpreted with some caution considering the small size of the recidivist sample but are, nonetheless, informative for discussions pertaining to policies designed to address recidivism.

## *Policy Implications*

The creation of the TRS began in response to a noted deficit in the literature regarding terrorist recidivism in the United States. The first wave of data collection in 2018 demonstrated surprisingly low recidivism rates of less than two percent. The second wave of data collection carried out in 2020 produced recidivism rates of approximately three percent. Although larger, these latter rates are still exceptionally low and provide a stark contrast to apolitical samples that report recidivism rates of 30, 50, or 80 percent, depending on the period of follow-up.[32] This begs the question: what facilitates these low recorded rates?

As mentioned previously, it is possible that political offenders are more adept at being discreet in their post-release illegal activities than are apolitical offenders. Unfortunately, examining this explanation is outside the purvey of this study. However, given the increased scrutiny under which political releasees are placed, this is an unlikely explanation for their recorded low rates of recidivism. Consider, for example, that many of the recidivists included in the TRS were caught for minor parole violations, including using a computer, driving a car, engaging in drug use, and the sale of fraudulent food stamps. These outcomes are a testament to the level of supervision to which political releasees are currently subjected, suggesting that deviance would likely be detected.

Two alternate explanations, however, are within the parameters of this article: a) political offenders are not prone to recidivate or b) political offenders take longer to recidivate than apolitical offenders. Regarding the first explanation, if political offenders are unlikely to recidivate, severe policy measures are an unnecessary infringement on freedoms and liberties. In addition, strict supervision and tracking could be an economic burden on the government and taxpayer. Although the population of political releasees is relatively small, additional supervision would require infrastructure, additional staff, and maintenance, suggesting a drain on already-limited criminal justice resources. If, however, political offenders are prone to recidivate, restrictive measures may be warranted in order to ensure the safety of the citizenry. The data support the former: these measures appear unnecessary and are likely a poor use of resources. Although recidivism rates increased between the two waves of data collection, the overall recidivism rates remain low, belying conventional expectations of re-offending patterns. In a sample of more than 600 offenders and more than 300 releasees, only 20 recidivated in total and only 11 recidivated post-release, suggesting that this is a unique group of offenders that falls outside the parameters of the existing criminological literature addressing recidivism. In

This content downloaded from
34.118.41.87 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

simple terms, the evidence suggests that political offenders are very unlikely to recidivate and, therefore, strict conditions upon release are unwarranted. In addition, as mentioned previously, many incidents of recidivism were minor parole violations, suggesting released extremists are already subjected to adequate scrutiny, primed to catch any criminal indiscretion. Therefore, policies and practices concerning political offenders may be effective in their current state, requiring no further revision or supplementation.

Regarding the second explanation, if political offenders experience a lag in recidivism, this may justify policy measures that consist of long-term supervision. In light of the expense in resources and human liberties that long-term supervision entails, this concession should be paired with a caveat: if recidivism is of a minor nature (e.g., parole violations), this kind of policy measure is subject to criticism since the expense of long-term supervision would likely outweigh the benefit of impeding minor offenses. The data offer limited support for a delay in recidivism but, given the minor nature of most of the offenses, do not lend credence to the argument that long-term supervision is justified. Specifically, there was an increase in recidivism rates between the two waves of data collection, suggesting that recidivism may be a delayed response in the political sample. However, the distribution of recidivism is similar to an apolitical sample; the majority recidivate within the first year and the remainder is spread out over the following decade or more. In addition, the rate remains small as does the sample size, allowing outliers to have a strong influence on results. Lastly, as mentioned previously, recidivism type tends toward minor offenses and parole violations. Therefore, although the data indicate a longer period of recidivism, the type of offenses political offenders engage in do not necessarily warrant increased or strict supervision.

Although the data do not support severe policy measures, this does not negate the need to continue data collection on this unique group of offenders. As more convicted extremists are reintegrated into the community, evidence-based predictions of their likelihood of a successful transition become more pressing. Collection of the TRS data will continue to focus on political offenders processed by the criminal justice system in the United States. If recidivism rates remain low and no significant lag in serious recidivism is uncovered, this will lend support for the position that extreme supervision measures are unnecessary.

Although the TRS is ideal for examining aggregate recidivism, it can also be applied to several additional important research questions. Offender matching and comparison is one area that warrants further study. For example, there is value in assessing the difference between political conformists and political recidivists; what factors separate these two groups and how do they compare to apolitical conformists and recidivists? In addition, what differentiates non-violent and violent political offenders and recidivists, other than their behaviors? The TRS data can also support innovative qualitative analysis, particularly in relation to questions of gender, race, and ethnicity. The female experience is notably missing from a great deal of terrorism research and it would be revealing to assess the factors that facilitate female offending among an extremist sample. Along similar lines, the role of ethnicity and race in criminal justice response to political offenders is under-studied; an examination of potential bias would offer an important addition to discussions revolving around institutionalized racism in the United States. Therefore, the TRS data inform discussions concerning aggregate recidivism rates but can also contribute to other conversations regarding extremism in the United States.

In conclusion, the results of both waves of data collection are clear. Political offenders do recidivate, but their rates of recidivism are low when compared to an apolitical population. In addition, when they do re-offend, it tends to be for minor and personally motivated crimes or parole violations. Therefore, extreme policy measures at the federal and state level appear unwarranted, unnecessarily intrusive, and uneconomical. Continued collection of the TRS data will provide additional guidance to policy makers and practitioners but, at this time, results offer the same reassurances that the large collection of literature supplies: extremist recidivism is limited in frequency and severity.

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

*About the Author:* **Omi Hodwitz** *is an assistant professor in the Department of Culture, Society and Justice at the University of Idaho and a research affiliate of the National Consortium for the Study of Terrorism and Responses to Terrorism (START) at the University of Maryland. Dr. Hodwitz specializes in data collection and analysis and the role of civil society in political violence. She has published articles in Sociological Spectrum, Behavioral Sciences and Political Aggression, Perspectives on Terrorism, and Applied Security Research. She has also published chapters in several books, including Routledge- and CRC-edited volumes.*

## *Notes*

[1] Hymes, C., McDonald, C. & Watson, E. (2021, August 6). "Seven months after the Capitol siege, more than 570 defendants have been arrested." *CBS News.* URL: https://www.cbsnews.com/news/us-capitol-riot-arrests-latest-2021-08-04/.

[2] Schnell, M. (2021, July 15). "Prosecutors request prison sentence for man carrying Trump flag in Senate chamber on Jan. 6." *The Hill.* URL: https://thehill.com/policy/national-security/563214-prosecutors-request-prison-sentence-for-man-carrying-trump-flag-in.

[3] Shields, C. A., Damphousse, K. R. & Smith, B. L. (2009). "How 9/11 changed the prosecution of terrorism"; in: *The impact of 9/11 and the new legal landscape* (pp. 125–144). New York, NY: Palgrave Macmillan. URL: https://doi.org/10.1057/9780230100053.

[4] Author Unknown (2015, November 5). "US faces task of helping terror suspects return to society." *Chicago Tribune.* URL: https://www.chicagotribune.com/news/nationworld/ct-terror-suspects-released-20151105-story.html.

[5] Author Unknown (2020, March). "Audit of the Federal Bureau of Prisons' monitoring of inmate communication to prevent radicalization." Office of the Inspector General, U.S. Department of Justice. URL: https://www.oversight.gov/sites/default/files/oig-reports/a20042.pdf. Williams, P. (2020, March 25). "Federal prisons aren't properly monitoring terrorist inmates, report says." *NBC News.* URL: https://www.nbcnews.com/politics/politics-news/federal-prisons-aren-t-properly-monitoring-terrorist-inmates-report-says-n1168616.

[6] Vidino, L. & Clifford, B. (2019). "A review of transatlantic best practices for countering radicalisation in prisons and terrorist recidivism." *ECTC Advisory Network Conference.* URL: https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/ECTC%20Transatlantic%20Practices.pdf. Rosand, E. (2017, March 28). "We need to prepare for the inevitable: When terrorists leave prison." *Time.* URL: https://time.com/4715307/terrorists-get-out-of-prison/.

[7] Convicted extremists incarcerated in the United States lack the benefit of special programming or deradicalization efforts. As noted by federal security officials, the Bureau of Prisons provides programming for gang members and domestic abusers, but not for terrorists. Levitt, M. (2017, March). "Defeating ideologically inspired violent extremism." *The Washington Institute.* URL: https://www.washingtoninstitute.org/policy-analysis/view/defeating-ideologically-inspired-violent-extremism; Author Unknown, "US faces task of helping terror suspects return to society."

[8] In 2017, Congressperson Rutherford introduced H.R. 2471, the Terrorist Release Announcements to Counter Extremist Recidivism Act (TRACER Act). Likened to a sex offender registry, the TRACER Act stipulates that the Department of Homeland Security notify fusion centers and state and local authorities when individuals convicted of federal terrorism-related offenses are released from incarceration. GovTrack (2020, March). S. 3467. URL: https://www.govinfo.gov/content/pkg/BILLS-116s3467is/pdf/BILLS-116s3467is.pdf. Duggan, J. (2019, January 3). "US terrorists to be named on sex offender-style registries in bid to prevent attacks," *The Express.* URL: https://www.express.co.uk/news/world/1066815/us-terrorists-sex-offender-type-registry-prisoners. Although the TRACER Act is the most visible response to this dilemma, it is not the only one. On the state level, Missouri, Florida, and Louisiana have proposed similar legislation, including registries and increased interagency communication. In addition, Richard Clarke, the chief advisor for the National Security Council during the Bush Administration, proposed a system of "specially trained parole officers" for this unique group of offenders. J. Duggan, "US terrorists to be named on sex offender–style registries in bid to prevent attacks." Beavers, O. (2018, September 14). "US faces new challenge with pending release of terror convicts." *The Hill.* URL: https://thehill.com/policy/national-security/406631-us-faces-new-challenge-with-pending-release-of-terror-convicts.

[9] Critics point out the importance of treating released extremists in a manner comparable to other offenders who have completed their sentence and, thus, paid their debt to society. Karen Greenberg, the director of the Center on National Security at Fordham University, for example, echoed this position when she opined that released extremists should be perceived as no "more dangerous than other people…convicted of committing a crime." Seamus Hughes, the director of the extremism program at George Washington University, offers a second point of opposition to severe legislative measures. He posits that some policies and practices may exacerbate radical sentiments and "push someone in the opposite direction of what you want to do." Beavers, O., "US faces new challenge with pending release of terror convicts."

[10] Silke, A. & Morrison, J. (2020). Re-offending by released terrorist prisoners: Separating hype from reality. *ICCT Policy Brief.*

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 18:35:56 UTC
All use subject to https://about.jstor.org/terms

URL: https://icct.nl/app/uploads/2020/09/Re-Offending-by-Released-Terrorist-Prisoners.pdf.

[11] Van der Heide, L. & Schuurman, B. (2018). Reintegrating terrorists in the Netherlands: Evaluating the Dutch approach. *Journal for Deradicalization*, 19, 196–239.

[12] Renard, T. (2020). Overblown: Exploring the gap between the fear of terrorist recidivism and the evidence. *CTC Sentinel*, 13 (4), 1–11. URL: https://ctc.usma.edu/overblown-exploring-the-gap-between-the-fear-of-terrorist-recidivism-and-the-evidence/.

[13] Reinares, F., Garcia-Calvo, C. & Vicente, A. (2018). Yihadismo y prisiones: un analisis del caso español. *Real Instituto Elcano*, ARI 123.

[14] Renard, T., "Overblown: Exploring the gap between the fear of terrorist recidivism and the evidence."

[15] Author Unknown (2019). Summary of the Reengagement of Detainees Formerly Held at Guantanamo Bay, Cuba. *Director of National Intelligence*. URL: https://www.dni.gov/files/documents/Newsroom/Reports%20and%20Pubs/Final_Version_11-26-19_ATTACH_Declassified_Summary_Reengagement_of_GTMO_Detainees_19-1392_A-DNI_Approved.pd.pdf.

[16] House of Lords (2020, January). *Terrorism: Prisoners' release*. URL: https://questions-statements.parliament.uk/written-questions/detail/2020-01-27/HL782/.

[17] See, for example, Department of Justice (2018, May). *2018 update on prisoner recidivism: A 9-year follow-up period (2005–2014)*. URL: https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf.

[18] Silke, A. & Morrison, J., "Re-Offending by released terrorist prisoners: Separating hype from reality."

[19] Hodwitz, O. (2019), "The Terrorism Recidivism Study (TRS): Examining recidivism rates for post-9/11 offenders." *Perspectives on Terrorism*, 13 (2), 54–64.

[20] Data sets that proved particularly helpful in case identification included the *Global Terrorism Database* from the University of Maryland, the *Intercept's Trial and Terror* data set, and Kurzman's *Muslim-American Extremism* data set.

[21] This variable was not added to further a narrative that terrorists are Middle Eastern and/or Arab in descent; instead, it was added in recognition that it would be a valuable variable to include when examining racially and ethnically motivated sentencing disparities across the United States.

[22] A violent offense, for example, involved the possession of weapons, an offender traveling with the intention of carrying out an attack, or actively engaging in training with the intention of carrying out an attack. A non-violent financial crime involved spending or contributing money in furtherance of extremist-oriented goals. This often included making donations or raising funds, paying for the travel of others, and selling or buying items for a terrorist organization. A non-violent non-financial crime included everything that did not fit in the first two categories, such as immigration violations, lying to authorities, and destroying evidence or obstruction. If an individual committed multiple and diverse offenses, they were coded for the most severe of those offenses, in the following order: violent, non-violent financial, and non-violent and non-financial.

[23] Although the focus in this article is on providing the overall outcomes of all offenders included in the updated TRS, this article will be followed by another that examines female extremists in detail. Due to their small numbers, this population is often overlooked in the literature and this likely hinders our ability to understand both terrorist activity and recidivism.

[24] The original version of the TRS reported a much smaller set of group affiliations. While updating the data set in 2020, we engaged in a deep dive into terrorist websites with the intention of locating later claims of responsibility that were not included in the early media reports or court records used to code the original TRS. This increased the number of affiliations reported in the updated TRS. In addition, we were able to eliminate several competing claims of responsibility.

[25] In the event that a score of 30 years artificially deflated the quantitative quality of a life sentence, the average was also assessed excluding the 'lifers', with a life sentence value of 40 years, and again with a life sentence value of 50 years. This resulted in averages of 11.5 years, 13 years, and 13.6 years respectively.

[26] In order to offer a more refined analysis, cases were omitted that included reported financial administrative fees (these ranged between $100 and $200). In the 2018 data, these cases were coded as fines.

[27] Department of Justice, "2018 update on prisoner recidivism: A 9-year follow-up period (2005–2014)."

[28] The five not subject to supervised release included the 'lifers,' one unknown outcome, one individual sentenced to 27.5 years of incarceration, and one individual sentenced to 2 months of incarceration.

[29] United States Sentencing Commission (2016, March). *Recidivism among federal offenders: A comprehensive review.* URL: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf; Department of Justice, "2018 update on prisoner recidivism: A 9-year follow-up period (2005–2014)."

This content downloaded from
34.118.41.82 on Wed, 16 Nov 2022 15:35:56 UTC
All use subject to https://about.jstor.org/terms

[30] As noted previously, the Department of Justice found that approximately 44 percent of state releasees re-offended in their first year. Department of Justice, "2018 update on prisoner recidivism: A 9-year follow-up period (2005–2014)."

[31] Government statistics do not often report on the average number of years required for recidivism to occur given that this is a dynamic figure that changes, depending on the period of observation. This makes comparisons between a political and apolitical sample difficult and subject to criticism. Therefore, the average length presented in this article should be interpreted as an interesting characteristic of the TRS sample and not as a point of comparison to an apolitical sample.

[32] See, for example, Department of Justice, "2018 update on prisoner recidivism: A 9-year follow-up period (2005–2014)."

This content downloaded from
34.118.41.85 on Wed, 16 Nov 2022 18:35:56 UTC
All use subject to https://about.jstor.org/terms